## UNITED STATES v. SANDERS.

### No. 2931.

Circuit Court of Appeals, Tenth Circuit.

Oct. 30, 1944.

Marvin Taylor, Atty., Dept. of Justice, of Louisville, Ky. (Cleon A. Summers, U. S. Atty., and Marvin Shilling, Asst. U. S. Atty., both of Muskogee, Okl., on the brief), for the United States.

Kelly Brown, of Muscogee, Okl. (J. Fred Green and Baker Wall, both of Sallisaw, Okl., on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

Sanders instituted this action against the United States under Private Law 634, Part 2, 56 Stat. 1259.

The Private Law conferred jurisdiction upon the United States District Court for the Eastern District of Oklahoma to hear, determine, and render judgment, without a jury, upon the claim of Sanders for damages allegedly sustained by him as a result of the injury and death of approximately 150 head of cattle, by reason of the alleged neglect of an inspector of the Bureau of Animal Industry, Department of Agriculture, in the dipping of such cattle for the elimination of ticks, preparatory to interstate shipment. It provided that the action might be instituted at any time within one year after the enactment of the Private Law, notwithstanding any statute of limitations, and that proceedings for the determination of the claim, appeals therefrom, and payment of any judgment should be the same as in cases over which such court had jurisdiction under the provisions of paragraph 20 of § 24 of the Judicial Code, as amended 28 U.S.C.A. § 41(20).

The Bureau of Animal Industry was created by the Act of May 29, 1884, 23 Stat. 31, 7 U.S.C.A. § 391.

The Act of March 3, 1905, 33 Stat. 1264, 21 U.S.C.A. §§ 123, 125, 126, authorizes and directs the Secretary of Agriculture to quarantine any state or territory or the District of Columbia, or any portion of any state or territory or of the District of Columbia, when he shall determine that cattle therein are affected with any contagious, infectious, or communicable disease, and to give notice thereof. It further authorizes and directs the Secretary of Agriculture, when the public safety will permit, to "make and promulgate rules and regulations which shall permit and govern the inspection, disinfection, certification, treatment, handling, and method and manner of delivery and shipment of cattle * * * from a quarantined State or Territory or the District of Columbia, and from the quarantined portion" thereof "into any other State or Territory or the District of Columbia." It further provides that cattle may be moved from a quarantined area into any other state or territory or the District of Columbia, under and in compliance with rules and regulations of the Secretary of Agriculture, and prohibits such movement in manner or method

or under conditions other than those prescribed by the Secretary of Agriculture.

Regulations promulgated by the Secretary of Agriculture provide that when the Secretary shall determine that cattle or other livestock in any state, territory, or the District of Columbia are affected with any contagious, infectious, or communicable disease for which a quarantine should be established, a rule will be issued placing in quarantine such state, territory, or the District of Columbia, or any portion thereof, in which the disease exists. 9 CFR 71.2. Such regulations provide that cattle in areas where tick eradication is being systematically conducted in cooperation with the state authorities, or cattle presented at a properly-equipped dipping station which, on inspection by a Bureau inspector, are found to be apparently free from ticks, may, after one dipping in an approved arsenical solution under the supervision of a Bureau inspector and certification by such inspector, be shipped or transported interstate for any purpose, when accompanied to final destination by a certificate of a Bureau inspector showing that such cattle are free from ticks. 9 CFR 72.7, 72.9. Such regulations provide that the dipping of cattle for interstate movement shall be done only in a permitted dip and at a place where facilities are provided for dipping and for handling the cattle in a manner to prevent exposure to infection after the final dipping; that the cattle to be dipped, prior to dipping, shall be given an opportunity to drink sufficient water to quench their thirst; shall be carefully handled; shall not be dipped when they are in a heated or exhausted condition; and that the Department disclaims responsibility for any loss or damage resulting from the dipping. The regulations provide that an arsenical solution shall be used, for the minimum strength thereof, and for the testing thereof by the Bureau of Animal Industry by a portable testing outfit. 9 CFR 72.13.

The evidence adduced established these facts: On and prior to August 2, 1919, Sanders was engaged in raising cattle in Sequoyah County, Oklahoma. Prior to August 2, 1919, Sequoyah County had been declared a quarantine area under a rule issued by the Secretary of Agriculture. Dr. Roy T. Fisher, a veterinarian in the Bureau of Animal Industry, was charged with supervising the dipping of cattle in Sequoyah County.

Sanders notified Fisher that he desired to ship certain cattle. Fisher directed Sanders to notify George Fields, a local inspector, and have Fields charge the dipping vat. Fisher advised Sanders that he would supervise the dipping. Sanders notified Fisher he would have the cattle at the vat on August 2, 1919. On the morning of that day, Sanders moved 150 head of cattle from his pasture to the dipping vat. The distance of the movement was about one and one-half miles. The cattle were moved carefully and were permitted to rest and had access to water before they were dipped.

Fields apparently had not received Sander's message and had not come with the new arsenical solution to charge the vat. The vat had been charged with a dipping mixture on July 21, 1919, and had not been used since that date. The weather was hot. The maximum temperature was 106 degrees August 1, 106 degrees August 2, and 109 degrees August 3. There had been a substantial evaporation which increased the strength of the solution in the vat. Notwithstanding those facts, which Fisher knew, he directed Sanders to proceed with the dipping. Sanders did not know the dipping mixture had been in the vat since July 21, 1919, and had been subjected to substantial evaporation, which would increase the strength of the dipping mixture. Fisher did not mix the solution when the vat was charged on July 21, 1919. He did not test the solution in the vat on August 2. His testimony indicated, however, that the charging of the vat had been done under his supervision and had been reported to him. At the trial, he was asked if "as a matter of safety to the stock you dip and protection of the property of the owner of the cattle don't you feel it necessary to test the dip itself?" He answered, "It is a good precaution. But our men are trained and are honest men and we feel they know what they are doing and their reports are accurate * * * we feel the men we employ are conscientious and honest men; that they will give us the right test." Before dipping the cattle, Fisher inspected them and found that they were apparently free from ticks. After a few of the cattle had come through the vat, Sanders noticed they were rubbing against the sides of the pen and against each other and were kneeling down and rubbing their throats and jaws on the ground. Sanders called Fisher's attention

to the behavior of the cattle, stated he thought the dip was too strong, and told Fisher he did not want the cattle burned. Fisher did not reply to Sander's remonstrances other than to say "I will have to see the cattle go through the vat before I can issue you a paper." Dipping was completed resulting in injury to the cattle from which 26 head thereof died and the others suffered substantial deterioration in value.

On the same day, and after Sanders' cattle had been dipped, L. R. Horn, another cattleman, took his cattle to the same vat to be dipped. The first two or three of Horn's cattle that went through the vat were burned and later died from the burns. The dip was tested and a substantial quantity of water was added to the vat.

The trial court found that Fisher was negligent in not testing the strength of the solution which had remained in the vat, from July 21, 1919, to August 2, 1919; that the injury to the cattle resulted from their having been dipped in too strong an arsenical solution; that the injury to the cattle did not result from the manner in which Sanders handled his cattle; that the negligence of Fisher was the proximate cause of the injury to the cattle and resulting death of 26 head thereof; and that Sanders was not guilty of contributory negligence. From a judgment for Sanders for $5,808.00; the United States has appealed.

 The United States contends that it is not liable for the negligence of Fisher. It is a well-settled rule of law that the government is not liable for the negligence of its subordinate officers or agents employed in the public service, and that the only remedy to the injured party is by an appeal to Congress.[1] But it must be assumed that Congress had cognizance of that rule when it passed the Private Law. It must be reasonably construed to effectuate the intent of Congress. It plainly authorized a suit for negligence. Surely, it was not the intent of Congress that the court should entertain the suit, determine whether Fisher was guilty of negligence, and whether such negligence was the prox-

imate cause of the injury to the cattle of Sanders, and then deny relief on the ground that the United States was not liable for Fisher's negligence. On the contrary, we think it was the intent of Congress that if it was established that Fisher was negligent and that such negligence was the proximate cause of the injury to the cattle of Sanders, judgment should be awarded against the United States in favor of Sanders for the amount of the damages suffered.

 Fisher knew that the vat had been charged on July 21, 1919; that the weather had been hot; and that substantial evaporation had occurred which would increase the strength of the dipping mixture. Under those circumstances, we think it was negligence on the part of Fisher to direct Sanders to proceed with the dipping without testing the strength of the dipping mixture.

 We do not think Sanders was guilty of contributory negligence, as a matter of law, in proceeding with the dipping after he noticed that the first few cattle that went through the dip were acting abnormally. Sanders called Fisher's attention to the behavior of the cattle. Fisher was a skilled veterinarian; Sanders was a layman. Moreover, their knowledge of the pertinent facts was not equal. Fisher knew that the mixture had been in the vat since July 21, and had been subjected to substantial evaporation. Sanders was not cognizant of those facts. Notwithstanding Fisher's attention was called to the abnormal behavior of the cattle that had been dipped, Fisher directed the dipping to proceed. That, we think, was an implied assurance on Fisher's part that the dipping mixture would not seriously injure the cattle.[2] We do not think it can be said, as a matter of law, that Sanders, in going ahead with the dipping, failed to exercise that degree of care which a person of ordinary prudence would exercise under the existing facts and circumstances. We think the question was one for the trier of the facts.

The finding that the negligence of Fish-

1 Robertson v. Sichel, 127 U.S. 507, 515, 8 S.Ct. 1286, 32 L.Ed. 203; Schillinger v. United States, 155 U.S. 163, 167, 168, 15 S.Ct. 85, 39 L.Ed. 108; Bigby v. United States, 188 U.S. 400, 406, 23 S.Ct. 468, 47 L.Ed. 519; German

Bank of Memphis v. United States, 148 U.S. 573, 579, 13 S.Ct. 702, 37 L.Ed. 564.

2 Grannon v. Donk Bros. Coal & Coke Co., 259 Ill. 350, 102 N.E. 769, 772.

462

er was the proximate cause of the injury to the cattle and the death of 26 head thereof is supported by substantial evidence and is not clearly erroneous.

The judgment is, therefore, affirmed.