**BAILEY v. RICHARDSON et al.**
No. 10382.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 3, 1949.

Decided March 22, 1950.

Writ of Certiorari Granted June 5, 1950.
· See 70 S.Ct. 1025.

48

Mr. Thurman Arnold, Washington, D. C., with whom Messrs. Abe Fortas, Paul A. Porter and Milton V. Freeman, Washington, D.C., were on the brief, for appellant.

Mr. Howard C. Wood, Washington, D. C., of the Bar of the Court of Appeals of New York, *pro hac vice*, with whom Assistant Attorney General H. G. Morison, Mr. George Morris Fay, United States Attorney, Washington, D. C., and Mr. Edward H. Hickey, Special Assistant to the Attorney General, were on the brief, for appellees. Mr. Joseph M. Howard, Assistant United States Attorney, Washington, D. C., also entered an appearance for appellees.

Before EDGERTON, PRETTYMAN and PROCTOR, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a civil action brought in the United States District Court for the District of Columbia for a declaratory judg-

ment and for an order directing plaintiff-appellant's reinstatement in Government employ.[1] The defendants-appellees are the Administrator of the Federal Security Agency, the members of the Civil Service Commission, members of its Loyalty Review Board, and members of its Loyalty Board of the Fourth Civil Service Region. Answer to the complaint was made by the defendants-appellees, and affidavits were filed. Both plaintiff and defendants made motions for summary judgment. The District Court granted the motion of the defendants. This appeal followed. Upon motion filed in this court by the appellant, the Secretary of Labor was added as party appellee.

*The Facts.*

Appellant Bailey was employed in the classified civil service of the United States Government from August 19, 1939, to June 28, 1947. Upon the latter date she was separated from the service due to reduction in force. On March 25, 1948, she was given a temporary appointment, and on May 28, 1948, she was reinstated under circumstances to be related.

The regulations of the Civil Service Commission in effect at the time of appellant's reinstatement[2] made reinstatements subject to the condition that removal might be ordered by the Commission if investigation of the individual's qualifications, made within eighteen months, disclosed disqualification. The regulations listed as a disqualification:[3]

"(7) On all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States."

On July 31, 1948, two months after her reinstatement, Miss Bailey received from the Regional Loyalty Board of the Commission a letter and an enclosed interrogatory. The letter said in part:

"During the course of an investigation of your suitability for appointment, information was received which the Commission believes you should be given an opportunity to clarify. Consequently, there are inclosed an original and copy of an interrogatory to be answered by you under affirmation or oath.

\*　　\*　　\*　　\*　　\*　　\*

"Your cooperation in this matter will be appreciated."

The interrogatory said in part:

"As part of the process of determining your suitability for Federal Employment, an investigation of you has been conducted under the provisions of Executive Order 9835, which established the Federal Employees Loyalty Program. This investigation disclosed information which, it is believed, you should have an opportunity to explain or refute.

"The questions in the attached Interrogatory are based on the information received, and are to be answered in writing in sufficient detail to present fairly your explanation or answers thereto. \* \* \*

"You are further advised that you have the right, upon request, to an administrative hearing on the issues in the case before the Regional Loyalty Board. You may appear personally before the Board and be represented by counsel or representative of your own choice; and you may present evidence in your behalf. Such evidence may be presented by witnesses or by affidavit.

\*　　\*　　\*　　\*　　\*　\*　\*

"The Commission has received information to the effect that you are or have been a member of the Communist Party or the Communist Political Association; that you have attended meetings of the Communist Party, and have associated on numerous occasions with known Communist Party members.

\*　　\*　　\*　　\*　　\*　　\*

1. We take jurisdiction for declaratory judgment upon authority of United Public Workers v. Mitchell, 1947, 330 U.S. 75, 93, 67 S.Ct. 556, 91 L.Ed. 754.

2. Reg. 2.112, 12 Fed.Reg. 5937 (Sept.

6, 1947), 5 Code Fed.Regs. § 2.112 (1949 ed.).

3. Reg. 2.104, 12 Fed.Reg. 2832 (1947), as amended, 13 Fed.Reg.1978 (Apr. 13, 1948), 5 Code Fed.Regs. § 2.104 (1949 ed.).

"The Commission has received information to the effect that you are or have been a member of the American League for Peace and Democracy, an organization which has been declared by the Attorney General to come within the purview of Executive Order 9835.

\* \* \* \* \* \*

"The Commission has received information to the effect that you are or have been a member of the Washington Committee for Democratic Action, an organization which has been declared by the Attorney General to come within the purview of Executive Order 9835.

\* \* \* \* \* \*

"Are you now, or have ever been, a member of, or in any manner affiliated with, the Nazi or Fascist movements or with any organization or political party whose objective is now, or has ever been, the overthrow of the Constitutional Government of the United States?"

Miss Bailey answered the interrogatories directly and specifically, denying each item of information recited therein as having been received by the Commission, except that she admitted past membership for a short time in the American League for Peace and Democracy. She vigorously asserted her loyalty to the United States. She requested an administrative hearing. A hearing was held before the Regional Board. She appeared and testified and presented other witnesses and numerous affidavits. No person other than those presented by her testified.

On November 1, 1948, the Regional Board advised the Federal Security Agency, in which Miss Bailey was employed, that:

"As a result of such investigation and after a hearing before this Board, it was found that, on all the evidence, reasonable grounds exist for belief that Miss Bailey is disloyal to the Government of the United States.

"Therefore, she has been rated ineligible for Federal employment; she has been barred from competing in civil service examinations for a period of three years, and your office is instructed to separate her from the service."

On the same day, a letter was sent by the Board to Miss Bailey, reading in part:

"As shown in the attached copy of a letter to your employing agency, it has been found that, on all the evidence, reasonable grounds exist for belief that you are disloyal to the Government of the United States.

"Your application for or eligibility from each of the examinations mentioned below has been cancelled and you have been barred from civil service examinations in the Federal service for a period of three years from October 29, 1948. When the period of debarment has expired the Commission will, upon request, consider the removal of the bar.

"If you wish to appeal the Board's decision, the Loyalty Review Board, U. S. Civil Service Commission, Washington 25, D. C., should be notified within 20 days from the date of receipt by you of this letter."

Miss Bailey appealed to the Loyalty Review Board and requested a hearing. Hearing was held before a panel of that Board. Miss Bailey appeared, testified, and presented affidavits. No person other than Miss Bailey testified, and no affidavits other than hers were presented on the record.

On February 9, 1949, the Chairman of the Loyalty Review Board advised the Federal Security Agency that the finding of the Regional Board was sustained, and he requested that the Agency remove Miss Bailey's name from the rolls. Notice to that effect was sent to counsel for Miss Bailey on the same day. The full Board subsequently declined to review the conclusions of its panel.

Miss Bailey's position from May 28, 1948, to November 3, 1948, was that of a training officer (general fields) CAF-13.

*The Question.*

The rights claimed by and for appellant must be discovered accurately and defined precisely. The events with which we are concerned were not accidental, thoughtless or mere petty tyrannies of subordinate officials. They were the deliberate design of the executive branch of the Government, knowingly supported by the Congress.

The case presented for Miss Bailey is undoubtedly appealing. She was denied reinstatement in her former employment because Government officials found reasonable ground to believe her disloyal. She was not given a trial in any sense of the word, and she does not know who informed upon her. Thus viewed, her situation appeals powerfully to our sense of the fair and the just. But the case must be placed in context and in perspective.

The Constitution placed upon the President and the Congress, and upon them alone, responsibility for the welfare of this country in the arena of world affairs. It so happens that we are presently in an adversary position to a government whose most successful recent method of contest is the infiltration of a government service by its sympathizers. This is the context of Miss Bailey's question.

The essence of her complaint is not that she was denied reinstatement; the complaint is that she was denied reinstatement without revelation by the Government of the names of those who informed against her and of the method by which her alleged activities were detected. So the question actually posed by the case is whether the President is faced with an inescapable dilemma, either to continue in Government employment a person whose loyalty he reasonably suspects or else to reveal publicly the methods by which he detects disloyalty and the names of any persons who may venture to assist him.

■ Even in normal times and as a matter of ordinary internal operation, the ability, integrity and loyalty of purely executive employees is exclusively for the executive branch of Government to determine, except in so far as the Congress has a constitutional voice in the matter. All such employees hold office at the pleasure of the appointing authority; again except only for statutory limitations. Never in our history, even under the terms of the Lloyd-Lafollette Act (*infra*, note 8), has a Government employee been entitled as of right to the sort of hearing Miss Bailey demands in respect to dismissal from office. These well-established principles give perspective to the present problem.

The presentation of appellant's contentions is impressive. Each detail of the trial which she unquestionably did not get is depicted separately, in a mounting cumulation into analogies to the Dreyfus case and the Nazi judicial process. Thus, a picture of a simple black-and-white fact—that appellant did not get a trial in the judicial sense—is drawn in bold and appealing colors. But the question is not whether she had a trial. The question is whether she should have had one.

If the whole of this case were as appellant pictures it, if we had only to decide the question which she states and as she states it, our task would indeed be simple and attractively pleasant. But it is not so. We are dealing with a major clash between individual and public interests. We must ascertain with precision whether individual rights are involved, and we must then weigh the sum of those rights, if there be any, against the inexorable necessities of the Government. We must examine not only one side of the controversy but both sides.

## I.
### Conformity with Executive Order.

Appellant's first contention is that the procedure followed by the Loyalty Boards did not conform to the requirements of the Executive Order [4] which established them. That Order provided in part:

"The standard for the refusal of employment or the removal from employment in an executive department or agency on grounds relating to loyalty shall be that, on all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States."

■ Appellant says that "evidence" does not include, in our jurisprudence, information secretly disclosed to a hearing tribunal. That is certainly true, but the question is whether the President used the term in its jurisprudential sense or whether he merely meant "information". We think

---

4. Exec. Order No. 9835, 5 U.S.C.A. § 631 note, 12 Fed.Reg.1935 (1947), 3 Code Fed. Regs. 132 (Supp.1947).

he meant the latter. The Order, read as a whole, and particularly Part IV, conclusively and emphatically requires that the names of confidential informants be kept confidential. Moreover, the President, in a Memorandum published in the Federal Register of March 15, 1948,[5] specifically and unequivocally directed that all reports, etc., relating to these cases be kept in strict confidence. "Evidence", as appellant defines the word, would require that informants appear, either in person or by affidavit, in the proceeding and upon the record. If the Loyalty Boards were violating the President's instructions in so crucial a part of a program so widely publicized, he would surely have known it and would have corrected the error. The procedure followed represented an administrative interpretation of an administrative order, and the courts follow such interpretations unless the error is clear.[6] While "evidence" usually has the meaning urged by appellant, and always has that meaning in judicial proceedings, we think that in this context, and consistently with the clear purport and purpose of the Order, it means merely all the information available to the Boards.[7] The question is not what the word might mean otherwise or elsewhere; the question is simply what the President used it to mean.

■ It is also suggested that the Executive Order was violated in this case, in that the information furnished Miss Bailey in advance of the hearing lacked the specificity required by the Order. It did not include the names of informants against her or the dates or places of her alleged activities. Part II(2) (b) of the Executive Order provides: "The charges shall be stated as specifically and completely as, in the discretion of the employing department or agency, security considerations permit * * *." That particular section refers to persons in employment, but it may be as-sumed for present purposes that the same requirement was imposed by implication upon the Civil Service Commission in respect to applicants for employment. Certainly, no greater specification would be given applicants than is given permanent employees. Reading the quoted provision of the Order with the utmost stringency in behalf of the individual, it still leaves specificity a wholly discretionary matter. It is not possible to read the sentence otherwise. It unequivocally says so.

## II.
## Applicability of the Lloyd-Lafollette Act.

Appellant next says that she was dismissed in violation of an Act of 1912 known as the Lloyd-Lafollette Act.[8] That Act refers to persons "in the classified civil service". Appellant says that during her reinstatement and at the time of her removal she was in that service, because she had "a competitive status" from the time of her original employment and Congress by statute has defined "classified civil service" as including all persons who have been given "a competitive status".

Appellant's points are that this Act requires that an employee whose removal is sought shall be furnished with a copy of any charges preferred against him and that the removal must be by the employing agency, not by the Civil Service Commission. At best, these are narrow points upon the facts in this record. This appellant was advised of the nature of the information received, so that the open questions would be whether such information constituted "charges" and whether it was sufficiently specific. The actual removal was by the Federal Security Agency, the employing agency, and the point made is that that Agency could not act upon the request, instruction or order of the Civil Service Commission but must act upon its own independent determination. We think that at

---

5. F.R.Doc. 48-2337, dated March 13, 1948, 13 Fed.Reg. 1359.

6. Bowles v. Seminole Rock Co., 1945, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700.

7. See Federal Reserve System v. Agnew, 1947, 329 U.S. 441, 67 S.Ct. 411, 91 L. Ed. 408; Mitchell v. Cohen, 1948, 333 U.S. 411, 68 S.Ct. 518, 92 L.Ed. 774.

8. 37 Stat. 555 (1912), as amended, 62 Stat. 354 (1948), 5 U.S.C.A. § 652.

the time of her removal Miss Bailey was not within the terms of the Act, and so we need not consider these contentions as to what it would have required had she been.

Miss Bailey was in fact separated from the service from June 28, 1947, to either March 25 or May 28, 1948, a period of nine or eleven months. So the first question is whether during that period she was "in the classified civil service" within the meaning of the Lloyd-Lafollette Act. She was certainly unemployed, so far as the Government was concerned, but she says that, having a competitive status, she was in the service by statutory definition. The definition upon which she relies is, so far as material here:

"The expression 'classified civil service' as the same occurs in acts of Congress shall, unless otherwise provided, be construed to include all persons who have been or may be given a competitive status in the classified civil service, with or without competitive examination, by legislative enactment, or under the civil service rules promulgated by the President, * * *."[9] Despite obvious inadequacies as a definition, that provision shows that in order to be in the classified civil service a person must not only have a competitive status but must be in the service.

■ Status and service are different terms in civil service parlance. Competitive status is one which permits promotion, transfer, reassignment or reinstatement without competitive examination.[10] The term "service"[11] refers to positions or offices. A person is in the classified civil service when he has a competitive status and occupies a classified position in the executive branch of the Government.[12] He is not in the service when he does not occupy a position, even though he has competitive status.

■ One who has been separated from the service does not occupy a position and so is not in the service, even though he retains his competitive status. The point is made clear by the regulations governing reductions in force, which provide for separation and furlough as two totally different matters,[13] and again quite clear by reference to rulings on the Retirement Act.[14] That Act applies to employees in the classified service, but the regulations make clear that it does not apply to those who have been separated but not reinstated.

■ If appellant was not in the service while she was separated from it, the next question is whether her reinstatement placed her in the service within the meaning of the Lloyd-Lafollette Act. She was in fact reinstated conditionally. So the question is whether a condition imposed by the Commission upon a reinstatement is valid. A probational appointee is not "in the classified service" within the meaning of the Act,[15] although he has a competitive status.[16] That treatment is valid.[17]

Under the Constitution,[18] Congress may vest the appointment of inferior officers in the President alone or in the heads of departments. Congress, by statute in 1871,[19] provided that the President prescribe regulations for the admission of persons into the civil service. By statute in

9. Act of March 27, 1922, 42 Stat. 470, 5 U.S.C.A. § 679.

10. 5 Code Fed.Regs. § 4.301(a) (5) (1949 ed.).

11. Classified service, competitive service, classified (competitive) service, classified civil service are interchangeable expressions.

12. 5 Code Fed.Regs. § 4.301(a) (4) (1949 ed.).

13. 5 Code Fed.Regs. §§ 9.109, 9.110, 12.5, 12.101(e), 12.105 (1938); 5 Code Fed. Regs. § 20.9 (1949 ed.).

14. 5 Code Fed.Regs. § 9.104 (1938); 5 U.S.C.A. § 691 et seq.

15. Regulations under Civil Service Rule XII, 5 Code Fed.Regs. § 12.101 (1938).

16. 5 Code Fed.Regs. § 3.1(a) (1949 ed.).

17. Friedman v. Schwellenbach, 1946, 81 U.S.App.D.C. 365, 159 F.2d 22, certiorari denied 1947, 330 U.S. 838, 67 S.Ct. 979, 91 L.Ed. 1285, 5 Code Fed.Regs. § 12.101 (1938).

18. Art. II. § 2, cl. 2.

19. Rev.Stat. § 1753, 5 U.S.C.A. § 631.

1883,[20] it authorized the appointment of a Civil Service Commission as an aid to the President in preparing rules for carrying into effect the plans for a classified civil service.[21] By order effective May 1, 1947, the President directed the Commission to promulgate standards for the reinstatement or reemployment of former federal employees.[22] The Commission, by rule effective September 6, 1947,[23] made reinstatements subject to condition for eighteen months. By rule effective April 13, 1948,[24] the Commission announced as a disqualification the existence of reasonable grounds for belief of disloyalty. We can perceive no ground for holding invalid any link in that chain of authority.

■ No reason based upon principle appears for holding the imposition of conditions upon reinstatements to be invalid. The scheme of the civil service statutes is that an independent executive agency, under the President, have the function of filling open positions in what is known as the classified service. An employee separated from the service would be as completely out of Government employ as though he had never been in it, except for the regulations of that executive agency. They give him for a designated period of time a preference over other eligibles for placement, if a vacancy for which he is qualified occurs either in his former section or in another.[25] But for such regulations, an ex-employee would be merely another applicant. The point is that his placement, whether it be called appointment, reappointment or reinstatement, after he has been out of the service for a time, is just as much a function of the employment authority as is an original appointment. Appellant argues that the Lloyd-Lafollette Act negatives that idea. We find nothing

in it which does. We think that conditional reinstatement, like conditional appointment,[26] is valid.

■ Our conclusion on the point is that appellant, having been separated from the service for some months, was not "in the classified service" during that period, and that during the period of her conditional reinstatement she was subject to the regulations of the Civil Service Commission and was not in the classified service within the meaning of the Lloyd-Lafollette Act.

While our attention is upon the Lloyd-Lafollette Act, it should be noted that this statute affords an employee less in some respects than does the Executive Order we are studying. It may or may not require greater specificity in the statement of charges, but it requires no oral hearing whatever. And it no more requires confrontation by witnesses than does the Order. Of course, it is obvious that the President is not confined to the choice sought to be imposed upon him by appellant. Even if the full of her contentions were sustained by the court, the President would be free to refuse to appoint her without assigning any reason or giving her any explanation, or he could refer to a grand jury every person whom he has reasonable grounds to suspect of disloyalty. These are practical aspects of the controversy before us, but they tend to emphasize the fact that in giving to suspected employees the measures of protection afforded by his Executive Order the President was not acting from necessity.

### III.
### Validity of the Bar to Employment.

■ Appellant next says that the order of the Board which barred her from the federal service for three years, was constitutionally invalid under the decision of

20. 22 Stat. 403, as amended, 54 Stat. 1216, 5 U.S.C.A. § 632.

21. 22 Stat. 405 (1883), as amended, 5 U.S.C.A. § 633.

22. Exec. Order No. 9830, § 01.2(c), 3 Code Fed.Regs. 108 (Supp.1947).

23. Reg. 2.112(a) (3), 12 Fed.Reg. 5937,

5 Code Fed.Regs. § 2.112(a) (3) (1949 ed.).

24. Reg. 2.104(7), 13 Fed.Reg. 1978, 5 Code Fed.Regs. § 2.104(7) (1949 ed.).

25. 5 Code Fed.Regs., Part 20 (1949 ed.).

26. Borak v. Biddle, 1944, 78 U.S.App. D.C. 374, 141 F.2d 278, certiorari denied, 1944, 323 U.S. 738, 65 S.Ct. 42, 89 L. Ed. 591.

the Supreme Court in the Lovett case.[27] We agree with that contention. The Court in that case clearly held that permanent proscription from Government service is "punishment" and that punishment can be inflicted only upon compliance with the Sixth Amendment. The difference between permanent and limited proscription is merely one of degree and not one of principal. So far as this record shows, this proscription of employment was not pursuant to a general regulation. It was not required by a general classification by Congress or by general regulation of the Civil Service Commission or of the Loyalty Board. No reference to proscription appears in the Executive Order, the Attorney General's orders, or the statements of the Loyalty Board. A general order that no person who is denied permanent employment after a conditional appointment be reemployed for three years might well be valid. The bar in the present proceeding appears on the record to be one imposed by the Board upon this particular individual in this particular case as a matter of individual adjudication. We hold that the portions of the orders and directions of the defendants-appellees which purported to bar Miss Bailey from federal employ for three years, are invalid.

## IV.
### Constitutionality of the Dismissal.

█ We did not understand appellant to urge the unconstitutionality of her dismissal, apart from the three-year bar. But there is a difference of opinion among us in that respect, and we, therefore, state our views upon the point. First we consider the contentions respecting the constitutionality of the procedure pursued, and then we consider the constitutionality of the condition imposed upon the reinstatement. For the first purpose, we must assume that Miss Bailey was in the classified service without condition at the time of her removal from the rolls and that she was, therefore, dismissed from employment and not merely denied appointment; although, as we have

indicated, we do not agree with that view of her status. If her status was merely that of an applicant for appointment, as we think it was, her nonappointment involved no procedural constitutional rights. Obviously, an applicant for office has no constitutional right to a hearing or a specification of the reasons why he is not appointed. We, therefore, consider the constitutionality of the procedure followed in this case upon the assumption that a Government employee in the classified service is being dismissed because her superiors have grounds, which to them are reasonable, to believe that she is disloyal.
*Sixth Amendment.*

Our first inquiry is whether the Sixth Amendment applies to a dismissal from Government service. That Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

The Amendment in terms applies to criminal prosecutions, and requires not only confrontation by witnesses but also trial by jury. The process is a judicial process.

The Supreme Court held in the Lovett case, supra, that "punishment" can be inflicted lawfully only upon compliance with the Sixth Amendment. The decision in that case is one of the keys to the contention presented on behalf of appellant. The Court held permanent proscription from Government service to be such "punishment", but it did not, as we read the case, hold mere dismissal from Government service to be punishment in that sense. It had held in the Myers case,[28] and iterated

27. United States v. Lovett, 1946, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252.

28. Myers v. United States, 1926, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160.

in the Humphrey case,[29] that the dismissal of an executive official performing purely executive duties is an executive function. Throughout the entire opinion in the Lovett case, it was meticulously explicit in limiting its discussion to the proscriptive feature of the statute before it. If the Court had meant that mere dismissal from the Government service accomplishes a punishment which requires a·judicial trial, it would necessarily have overruled the Myers case and such cases as Parsons v. United States[30] and Shurtleff v. United States,[31] and all the other cases which have held dismissal of an executive employee to be an executive function. It is inconceivable to us that the Court could have intended so sweeping and startling a result without saying so. ·

Again, United Public Workers v. Mitchell[32] was first argued before the Lovett argument and was reargued after that argument, and was decided eight months after the Lovett decision. In the United Public Workers case, the Court held dismissal from service to be a function of Congress and the Executive, and it did so without mentioning the Lovett case. Mr. Justice Douglas, dissenting, referred to the Lovett case in another connection but did not intimate that the Lovett opinion was intended to establish that dismissal was punishment requiring judicial procedure. If the Lovett case did so hold, we cannot understand the United Public Workers case.

Moreover, if dismissal from Government service requires compliance with the Sixth Amendment, the Lloyd-Lafollette Act, which has been in uncontested effect since 1912, is unconstitutional. That statute specifically provides that in the process of dismissal of an employee from the classified civil service, "no examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer making the removal".[33]

If dismissal from the classified civil service requires judicial process, all the cases noted in the footnote below,[34] and many others, were erroneously decided, because they all upheld dismissal without such procedure.

In the last place, even if there were no decided cases upon the point, we would not think that the Constitution meant that the President could not dismiss a subordinate executive employee without the judicial procedure required by the Sixth Amendment. The fundamental concept of the division of powers, and so of responsibilities, does not, in our opinion,·permit the conclusion that the President cannot remove an employee in the executive branch without referring the matter to the judicial branch. And the long history of the controversy concerning removal from public office, beginning with the First Congress, cannot be read so as to permit that conclusion.[35]

29. Humphrey's Executor v. United States, 1935, 295 U.S. 602, 55 S.Ct. 869, 79 L. Ed. 1611. ·

30. 1897, 167 U.S. 324, 17 S.Ct. 880, 42 L. Ed. 185.

31. 1903, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 838.

32. 1947, 330 U.S. 75, 67 S.Ct. 556, 91 L. Ed. 754.

33. The legislative history throws little light on the intent of the provision. It was mentioned in the Senate debate and was subject to a proposed modifying amendment, not adopted. The impression left is that the provision was intended to mean what it plainly says. 48 Cong.Rec. 4653, 4738, 4988, 5002, 10370–78, 10728, 10790, 10804 (1912).

34. Maghan v. Board of Com'rs of District of Columbia, 1944, 78 U.S.App.D.C. 370, 141 F.2d 274; Levine v. Farley, 1939, 70 App.D.C. 381, 107 F.2d 186, certiorari denied 1940, 308 U.S. 622, 60 S.Ct. 377, 84 L.Ed. 519; Gadsden v. United States, 1948, 78 F.Supp. 126, 111 Ct.Cl. 487; Weinstein v. United States, 1947, 74 F.Supp. 554, 109 Ct.Cl. 579; Culligan v. United States, 1946, 107 Ct.Cl. 222, certiorari denied 1947, 330 U.S. 848, 67 S.Ct. 1092, 91 L.Ed. 1292; Golding v. United States, 1934, 78 Ct.Cl. 682, certiorari denied 1934, 292 U.S. 643, 54 S.Ct. 776, 78 L.Ed. 1494; Kellom v. United States, 1920, 55 Ct.Cl. 174; Eberlein v. United States, 1918, 53 Ct.Cl. 466, affirmed 1921, 257 U.S. 82, 42 S.Ct. 12, 66 L.Ed. 140; Page v. Moffett, C.C.N.J.1898, 85 F. 38.

35. Fish, Civil Service and the Patronage (N.Y.1905); Sageser, The First Two Decades of the Pendleton Act: A Study of Civil Service Reform (Lincoln, Neb.,

■ We are of opinion that compliance with the Sixth Amendment is not a prerequisite to the dismissal of an employee from the Federal Government classified civil service. It is apparently admitted on behalf of appellant that this conclusion is true generally speaking, but it is said that dismissal for suspicion of disloyalty is an exception and that an employee cannot be dismissed for that one particular reason without a jury trial, confrontation by witnesses, etc., in a judicial proceeding. We shall discuss that claim of exception in a moment.

*Fifth Amendment.*

■ It is next said on behalf of appellant that the due process clause of the Fifth Amendment requires that she be afforded a hearing of the quasi-judicial type before being dismissed. The due process clause provides: "No person shall $*$ $*$ $*$ be deprived of life, liberty, or property, without due process of law; $*$ $*$ $*$." It has been held repeatedly and consistently that Government employ is not "property" [36] and that in this particular it is not a contract.[37] We are unable to perceive how it could be held to be "liberty". Certainly it is not "life". So much that is clear would seem to dispose of the point. In terms the due process clause does not apply to the holding of a Government office.

Other considerations lead to the same conclusion. Never in our history has a Government administrative employee been entitled to a hearing of the quasi-judicial type upon his dismissal from Government service. That record of a hundred and sixty years of Government administration is the sort of history which speaks with great force. It is pertinent to repeat in this con-

nection that the Lloyd-Lafollette Act, sponsored and enacted by advocates of a merit classified government service, expressly denies the right to such a hearing. Moreover, in the acute and sometimes bitter historic hundred-year contest over the wholesale summary dismissal of Government employees, there seems never to have been a claim that, absent congressional limitation, the President was without constitutional power to dismiss without notice, hearing or evidence; except for the question as to officials appointed with the advice and consent of the Senate. That history has been told many times [38] and need not be repeated here. The controversy concerning the removal power began when the First Congress considered the establishment of the first executive department.[39] Since then the subject has involved many colorful events and personalities over the years, including such as Presidents Jefferson, Jackson, Lincoln, Cleveland, Hayes, Theodore Roosevelt and Woodrow Wilson. The effort to establish a degree of stability in Government employ, tempestuous though that effort has been at times, has been made in the Congress and before the Presidents and their advisers, as a legislative and executive problem.

■ The Constitution makes the President responsible for the execution of the laws and makes the Congress responsible for the vesting of appointments in the executive branch.[40] Those two authorities are, therefore, responsible for the ability, the integrity, and the loyalty of the personnel of the executive branch. That responsibility necessarily includes the power to choose employees for executive duty, and the power to remove those deemed not qual-

1935); Foulke, Fighting the Spoilsmen (N.Y.1919). See also the opinion of Chief Justice Taft in Myers v. United States, supra.

36. Taylor v. Beckham, 1900, 178 U.S. 548, 20 S.Ct. 890, 1009, 44 L.Ed. 1187, and cases there cited; Ex parte Sawyer, 1888, 124 U.S. 200, 8 S.Ct. 482, 31 L.Ed. 402; 2 Cooley, Constitutional Limitations 746, n. 1 (8th ed. 1927), and cases there cited.

37. Butler v. Commonwealth of Pennsylvania, 1850, 10 How. 402, 13 L.Ed. 472; Crenshaw v. United States, 1890, 134 U.S. 99, 10 S.Ct. 431, 33 L.Ed. 825.

38. See Note 35 supra.

39. Debate in the First Congress, 1 Annals of Cong. 473–608 (Gales & Seaton's History 1834).

40. Art. II, §§ 2, 3.

58

ified is a correlative power. No function is more completely internal to a branch of government than the selection and retention or dismissal of its employees. So it has been held many times that the power of removal is an incident of the power of appointment.[41]

■ In the absence of statute or ancient custom to the contrary, executive offices are held at the will of the appointing authority, not for life or for fixed terms.[42] If removal be at will, of what purpose would process be? To hold office at the will of a superior and to be removable therefrom only by constitutional due process of law are opposite and inherently conflicting ideas. Due process of law is not applicable unless one is being deprived of something to which he has a right.

Constitutionally, the criterion for retention or removal of subordinate employees is the confidence of superior executive officials. Confidence is not controllable by process. What may be required by acts of the Congress is another matter, but there is no requirement in the Constitution that the executive branch rely upon the services of persons in whom it lacks confidence. The opinions in the Myers case, supra, make this proposition amply clear, and those in United Public Workers v. Mitchell, supra, amply confirm it.

Of course, the due process clause may limit executive power and does so when that power is exercised in some fields. So the full of the considerations which we have mentioned in respect to the Sixth Amendment are not applicable here. But the many cases which we cited in that connection [43] and the hitherto accepted validity of the Lloyd-Lafollette Act are pertinent here. If the due process clause requires an administrative hearing of the quasi-judicial type prior to dismissal from Government service, all those cases were erroneously decided and the Lloyd-Lafollette Act is invalid. To justify so drastic a result, we would have to find it inescapable. We do not find it so.

■ We hold that the due process of law clause of the Fifth Amendment does not restrict the President's discretion or the prescriptive power of Congress in respect to executive personnel.[44]

We do not reach the question whether, if the due process of law clause does apply, it requires more than this appellant was given. Miss Bailey was not summarily cut off the rolls. She was advised in writing that information concerning her qualifications for Government employ had been received; she was asked specific questions; and she was told that those questions reflected the information received. The questions revealed the nature of the alleged activities giving rise to the inquiry and the names of the organizations in which she was alleged to have been active. Everything that she wished to present was received; all affidavits offered by her were accepted, and all witnesses presented by her testified. She was twice heard orally. She was represented at all stages by competent counsel. Her case was considered by two separate groups of executive officials. On the other hand, she was not told the names of the informants against her. She was not permitted to face or to cross-examine those informants. She was not given the dates or places at which she was alleged to have been active in the named alleged subversive organizations. So the claim in her behalf necessarily goes farther than an abstract claim for due process of law. The claim must be that the due process clause requires, in dismissals of subordinate Gov-

---

41. Ex parte Hennen, 1839, 13 Pet. 230, 10 L.Ed. 138; Parsons v. United States, supra; Keim v. United States, 1900, 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774; Shurtleff v. United States, supra; Levine v. Farley, 1939, 70 App.D.C. 381, 107 F.2d 186, certiorari denied 1940, 308 U.S. 622, 60 S.Ct. 377, 84 L.Ed. 519.

42. Ex parte Hennen, supra note 41;

Parsons v. United States, supra. See Note, Constitutional Limitations on Political Discrimination in Public Employment, 60 Harv.L.Rev. 779 (1947).

43. See note 34 supra.

44. See Field, Civil Service Law 205 (1939); Comment, Civil Service: Validity of Loyalty Tests for Federal Employees, 36 Cal.L.Rev. 596 (1948).

ernment employees, specificity in charges equivalent to that of valid criminal charges, confrontation by witnesses, cross examination of them, and hearing upon evidence openly submitted. Even if the due process clause applies, we would think it does not require so much.[45]

Here again it is apparently conceded on behalf of appellant that our conclusions in respect to the Fifth Amendment are sound generally speaking, but an exception is claimed in the cases of those dismissed for suspicion of disloyalty. As we have said, we shall discuss that claimed exception in a moment.

*First Amendment.*

 It is next said that appellant's dismissal impinged upon the rights of free speech and assembly protected by the First Amendment, since the dismissal was premised upon alleged political activity. This suggestion goes not to the procedure but to the ultimate validity of the dismissal itself. But the plain hard fact is that so far as the Constitution is concerned there is no prohibition against the dismissal of Government employees because of their political beliefs, activities or affiliations. That document, standing alone, does not prevent Republican Presidents from dismissing Democrats or Democratic Presidents from dismissing Republicans. From the beginning, such has been the practice, with variations in scope. The reason that it has not continued to so great an extent is because the people became convinced that it was not good government and the Congress and the President wrote that view into statutes and regulations. They, not the Constitution, give Government employees such protection as they have against dismissal for political reasons.

Objective perusal of civil service history reveals two philosophical sides to the controversy. President Washington wrote to Timothy Pickering in 1795, "I shall not,

whilst I have the honor of administering the government, bring men into any office of consequence knowingly whose political tenets are adverse to the measures the general government is pursuing; for this, in my opinion, would be a sort of political suicide."[46] President John Adams removed men from office for purely political reasons, and every President since that time has done so. On the other hand, the philosophy of a merit system is well known and vigorously supported. But there is a respectable doubt whether a solidified government service impervious to the popular will is in the long run an unalloyed benefit.[47] Proponents of the merit system recognize that employment upon merit alone may require divestment of the Government service of all political manifestations and characteristics whatever. Be that as it may, when one contemplates the problem in the light of the contrariety of views vigorously held by able statesmen and scholars, it seems clear beyond doubt that the Constitution itself did not resolve the controversy. The Constitution did not write political miscellany of personnel into the structure of the executive branch; Congress has done that. The First Amendment guarantees free speech and assembly, but it does not guarantee Government employ. It does not say that if the people elect an executive and a legislature with specified political objectives, those officials must work through subordinates of other political tenets, if, perchance, such are then in office.

Congress provided in 1939 that "No officer or employee in the executive branch of the Federal Government, or any agency or department thereof, shall take any active part in political management or in political campaigns."[48] That was an unequivocal denial of the rights of persons in federal employ to make political speeches. The same rule had been in effect as to the classi-

45. Compare Scher v. United States, 1938, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151.

46. Fish, Civil Service and the Patronage 13–14 (N.Y.1905), citing Washington, Writings (Ford ed.), xii, 107.

47. See Editorial Note, Political Activities of Federal Civil Servants, 15 Geo. Wash. L.Rev. 443 (1947).

48. Sec. 9(a) of Act of Aug. 2, 1939, called the Hatch Act, 53 Stat. 1148, as amended, 5 U.S.C.A. § 118i(a).

fied service by executive order since 1907.[49] The Supreme Court upheld the statute [50] upon the ground that "Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection." [51] There is no need to repeat here the reasons and the authorities upon which that decision was reached. It sets at rest the broad contention that Congress and the President may not, in the interest of efficiency, impinge upon otherwise inviolate rights of Government employees to free participation in political speech and assembly.

The situation of the Government employee is not different in this respect from that of private employees. A newspaper editor has a constitutional right to speak and write as he pleases. But the Constitution does not guarantee him a place in the columns of a publisher with whose political views he does not agree.

Government employment is subject to many restrictions upon otherwise unrestricted individual rights in respect to activities, property ownership, etc., as the Supreme Court long ago pointed out.[52]

Cummings v. Missouri[53] and Ex parte Garland,[54] decided together, are not pertinent here. They involved rights to pursue ordinary vocations, one that of a priest and the other that of a lawyer, which the Court held to be part of the right to happiness and liberty basic in our system. But there is no basic right to Government employ, any more than there is to employment by any other particular employer. The Supreme Court in the Garland case was careful to point out: "The profession of an attorney and counselor is not like an office created by an act of Congress, which depends for its continuance, its powers and its emoluments, upon the will of its creator, and the possession of which may be burdened with any conditions not prohibited by the Constitution." [55] Moreover, the Court would not have held that the priest in the Cummings case had a right to serve a particular parish where the parishioners disapproved his views, or that the lawyer in the Garland case had a right to retainer from a particular client. So Miss Bailey may have a perfect right to devote her life to personnel training, but that does not include the right to employment by whatever employer she happens to choose.

In the United Public Workers case,[56] the Supreme Court said that the power of Congress in these regards is subject to limitation, but it set the boundary thus: "For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service."

*Discrimination.*

It is said that the loyalty program as applied in this particular case went beyond the power of the Congress and of the President to regulate the conduct of Government employees.[57]

49. Exec. Order No. 642, June 3, 1907; 24th Annual Report, Civil Service Commission, H.R.Exec.Doc.No.600, 60th Cong., 1st Sess. 104.

50. United Public Workers v. Mitchell, supra.

51. Id. 330 U.S. at page 99, 67 S.Ct. at page 569, 91 L.Ed. 754.

52. Ex parte Curtis, 1882, 106 U.S. 371, 1 S.Ct. 381, 27 L.Ed. 232. See also Note, Restrictions on the Civil Rights of Federal Employees, 47 Col.L.Rev. 1161 (1947); Note, Political Sterilization of Government Employees, 47 Col. L.Rev. 295 (1947); Mosher and Kingsley, Public Personnel Administration 386 (1941).

53. 1867, 4 Wall. 277, 71 U.S. 277, 18 L. Ed. 356.

54. 1867, 4 Wall. 333, 71 U.S. 333, 18 L. Ed. 366.

55. 4 Wall. 378, 71 U. S. at 378, 18 L.Ed. at 370.

56. Supra at 330 U.S. 101, 67 S.Ct. 570, 91 L.Ed. 754.

57. For the development of principles and procedure in respect to loyalty among Government employees, see Emerson and Helfield, Loyalty Among Government Employees, 58 Yale L.J. 1. (1948), and reply of J. Edgar Hoover, A Comment on the Article "Loyalty Among Government Employees", 58 Yale L.J. 401 (1949); Cor-

We must at this point be careful to note the precise ground upon which appellant was dismissed. It was that in the judgment of authorized executive officials "reasonable grounds exist for belief that Miss Bailey is disloyal to the Government of the United States." [58] So far as we have been able to ascertain, it is nowhere disputed that employees in fact disloyal to the Government may and should be removed. [59] A classification of loyal and disloyal is undoubtedly a proper one descriptive of qualification and disqualification for public office. Appellant says: "We are of course not suggesting that a government employee who is reinstated in his job is immune from inquiry into his loyalty." So the points made in behalf of appellant must be these: (1) That mere belief on the part of executive officials of disloyalty, even though supported by grounds reasonable to them, is not a sufficient basis for valid removal. (2) That if the power to remove be limited, some authority other than executive or legislative must be able to determine whether the limitation be transgressed, and so the grounds for executive belief must be fully revealed. (3) That the information concerning appellant, as reflected in the interrogatory sent to her, does not, even if true, constitute reasonable ground for belief in her disloyalty.

The first proposition is in effect that reasonable ground for belief of disloyalty is not sufficient prerequisite to dismissal. But we can perceive no basis for holding that the executive departments must retain in the service those whose loyalty is reasonably doubtful. Reasonably grounded suspicion of disloyalty indicates a risk, and no concept of the Constitution requires the executive to endure recognizable and preventable risks in the administration of the law. He may decide to do so, but we see no basis for saying that he must. The Constitution does not require the President to continue to use in the training of Government personnel, the work performed by this appellant, a person whose loyalty to the Government he suspects. There is no reason in the Constitution why the President should not limit the training staff to persons whose loyalty is beyond the faintest shadow of suspicion.

The clear and present danger rule does not help us in this matter, [60] because Government employ, with which we are here dealing, is not a right. The argument that the rule does apply confuses the subject matter of the controversy. No one denies Miss Bailey the right to any political activity or affiliation she may choose. What is denied her is Government employ. The argument upon the clear and present danger rule, therefore, must be that Miss Bailey has a right to Government employ unless her presence there would constitute a clear and present danger. There simply is no such right. To state the proposition is to demonstrate its untenability. The President certainly does not have to appoint any and all qualified persons to public office. And the Constitution does not require him to keep in office everyone who is qualified. Even if appellant had been qualified beyond shadow of suspicion, she could have been released from the service, so far as the Constitution is concerned. The clear and present danger rule is entirely foreign to the whole matter.

The second proposition concerns the mode of determining the sufficiency of a doubt of loyalty. If reasonable grounds for belief of disloyalty suffice for dismissal, in whose mind must such reasonable grounds be established?

win, the President: Office and Powers 121 et seq. (3d ed.1948); Statement of the Loyalty Review Board, 13 Fed.Reg. 9364, 5 Code Fed.Regs., part 200, p. 195 (1949 ed.).

58. Supra notice of the Regional Loyalty Board to the Federal Security Agency, later sustained by the Loyalty Review Board.

59. National Committee on Constitutional Liberties, National Lawyers Guild, The Constitutional Right to Advocate Political, Social and Economic Change: An Analysis of Proposed Federal Legislation and Executive Order 9835, 7 Law.Guild Rev. 57, 68 (1947).

60. Contra: See Sherman, Loyalty and the Civil Servant, 20 Rocky Mt. L.Rev. 381 (1948).

■ Much argument at this point is premised upon the possibility of abuse of the removal power. It is said that if executive officers have power to remove without compliance with restrictive measures they may by terror destroy free thought and action in the Government service and so establish a tyranny. This fear is not new. It was held by some members of the First Congress and urged by them in the debate upon the removal power.[61] But under our system of government the courts cannot assume a possible abuse of constitutional power as a reason for denying that power. Almost every power, constitutional, statutory, regulatory, contractual or whatnot, is susceptible of abuse. The Constitution bestows the several powers of government with such checks and balances as the makers of the Government deemed necessary and adequate. All executive power, with the stated limitations, was vested by the Constitution in the executive branch, and no part of it was vested in the judicial branch. The judicial branch can no more assume to limit executive power because of a possible abuse by executive officials than can executive officials limit judicial power because of possible abuse by judicial officers. Abuse of power is, of course, forbidden, but the mere potentiality of abuse does not constitute invalidity of power. We cannot declare an act unconstitutional merely because under it there is a possibility of abuse.

■ If the power of removal be not lodged in the President and his designated subordinates, pursuant to prescriptions of the Congress, where is it lodged? The only alternative is that grounds for dismissal from executive service appear satisfactory to the judicial branch of government. The Supreme Court, in the United Public Workers case, supra, as we have pointed out, defined the criterion as the reasonable judgment of Congress as to the efficiency of the service. And it must have so held, because, as Mr. Madison said to the First Congress, "It is evidently the intention of the constitution, that the first Magistrate should be responsible for the executive department; so far therefore as we do not make the officers who are to aid him in the duties of that department responsible to him, he is not responsible to his country."[62] And others expressed the same view. The judiciary cannot assume responsibility for the sufficiency of the qualifications of executive employees without assuming corresponding responsibility for the conduct of executive affairs. It has no such power. The courts cannot hold as a rule of law that grounds for disqualification of subordinate executive employees reasonable in the mind of the executive must also be reasonable in the mind of the courts.[63] It is inescapable from the Constitution's separation of powers that the qualification and disqualification of executive employees is for executive determination; and so, if it be established that suspicion of disloyalty is proper ground for disqualification, it follows that the existence of such suspicion is for executive determination.

■ This brings us to the third proposition upon this subject, which is that the revealed information in this particular case is insufficient ground for suspicion of disloyalty. It is said that the interrogatory showed that the basis for Miss Bailey's dismissal was an alleged membership in the Communist Party and other allegedly "subversive" organizations, and that this is an invalid discrimination.

It is perfectly true, as the Supreme Court said in the United Public Workers case,[64] that Congress could not legislate that "no Republican, Jew or Negro shall be appointed to federal office". But if a Democratic President were to appoint few, if any, Republicans to office, or vice versa, he would not be violating any provision of the Constitution. Vigorous as the condemnation of the practice has been, even in recent years, nowhere, so far as we are aware, has it

---

61. E. g., 1 Annals of Cong. 476 (Gales & Seaton's History 1834).

62. Id. at 480.

63. See Shurtleff v. United States, supra; Myers v. United States, supra at 272

U.S. 117, 122, 47 S.Ct. 25, 27, 71 L.Ed. 160.

64. Supra at 330 U.S. 100, 67 S.Ct. 569. 91 L.Ed. 754.

been responsibly asserted that such selection is invalid. In blunt terms, the President can discriminate for political reasons. We do not think the Supreme Court meant, by the quoted sentence, that if the President or his authorized aides exercised the prerogative of selecting employees by selecting no Republicans, the choices would be constitutionally void. Some astonishing results would ensue from any such holding. The Court was referring to permanent, blanket proscription by the Congress. Of more importance, the classifications named in the quoted suggestion have no discernible bearing upon qualification for office. Such a statute would be purely arbitrary and capricious in the most obnoxious meaning of those words.

Our conclusion upon this phase of the case, therefore, is that the loyalty program established by the President's Order and applied to this appellant is not, for any of the reasons thus far discussed, invalid.

*An Exception is Claimed.*

Thus the controversy develops, step by step, to its ultimate crisis. It is urged upon us that dismissal from Government employ for suspicion of disloyalty is an exception to the established doctrines and rules generally applicable to Government employees and their dismissal from service.

It is said on behalf of appellant that disloyalty is akin to treason and that dismissal is akin to conviction. Forthwith it is asserted that Miss Bailey has been convicted of disloyalty. As we have seen, nothing resembling a conviction from the legal standpoint has been visited upon her. She was merely refused Government employment for reasons satisfactory to the appointing authorities.

 But it is said that the public does not distinguish, that she has been stigmatized and her chance of making a living seriously impaired. The position implicit in that assertion dissolves into two contentions. One is that even if executive authorities had power to dismiss Miss Bailey without a judicial hearing, they had no power to hurt her while doing so; that is, they had no power to call her disloyal even if they had power to dismiss her for that reason. But it has long been established that if the Government, in the exercise of a governmental power, injures an individual, that individual has no redress.[65] Official action beyond the scope of official authority can be prevented or nullified by the courts, and so official action which violates a constitutional right of an individual can be rectified. But if no constitutional right of the individual is being impinged and officials are acting within the scope of official authority, the fact that the individual concerned is injured in the process neither invalidates the official act nor gives the individual a right to redress. So, in the present case, if Miss Bailey had no constitutional right to her office and the executive officers had power to dismiss her, the fact that she was injured in the process of dismissal neither invalidates her dismissal nor gives her right to redress; this under a rule of law established long ago. The Second Circuit had the problem before it recently in a damage suit,[66] and Judge Learned Hand, writing for that court, observed, as might well be observed in respect to the case now at bar, "True, so stated, that seems at first blush a startling proposition". But, he later said, "As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative", and the court concluded that both upon authority and upon reason the rule laid down should be followed.[67] And a person may be publicly stigmatized and ruined by utterances on the floor of Congress without any opportunity in any established forum to deny or to refute.[68] These harsh rules, which run counter to

65. Cooper v. O'Connor, 1938, 69 App. D.C. 100, 104, 99 F.2d 135, 139, 118 A. L.R. 1440, certiorari denied 1938, 305 U. S. 643, 59 S.Ct. 146, 83 L.Ed. 414, and cases there cited; Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; cases collected in United States v. Sanders, 10 Cir. 1944, 145 F.2d 458.

66. Gregoire v. Biddle, 1949, 177 F.2d 579, 580.

67. See 38 Geo.L.J. 327 (1950).

68. Cochran v. Couzens, 1930, 59 App.D.C. 374, 42 F.2d 783, certiorari denied 1930, 282 U.S. 874, 51 S.Ct. 79, 75 L.Ed. 772, and cases there cited.

every known precept of fairness to the private individual, have always been held necessary as a matter of public policy, public interest, and the unimpeded performance of the public business. On behalf of the individual, our sense of justice rebels, but the counterbalancing essentials of effective government lead us to assent without equivocation to the rules of immunity.

 The line of cases in which this court has said that courts will not review the action of executive officials in dismissing executive employees, except to insure compliance with statutory requirements, is unvaried.[69] As early as 1904, this court said that the rule had been announced so many times as not to require citation of authority.[70] In Levy v. Woods [71] we said, quoting the Court of Claims, "The allegations that the plaintiff was innocent of the charges preferred against him * * * and that the investigation which resulted in his removal was biased, prejudiced, and unfair, are immaterial".

The rule is applied even when the charges involve offenses of serious moral turpitude. Eberlein was discharged for accepting bribes,[72] Kent for malfeasance in office,[73] and Golding for repeated attempts at seduction by force.[74]

It should be remarked parenthetically that, in so far as the case before us is concerned, any publicity which it received was not pursuant to but in flat contradiction of the Executive Order, the Attorney General's instructions, and the Loyalty Board's rules, all of which forbid publicity. Moreover, Miss Bailey accepted voluntarily the conditional reappointment which was premised upon her successful passage of the loyalty test laid down in the Executive Order.

The other contention implicit in the assertion, that Miss Bailey has been stigmatized and injured, is that disloyalty is a thing apart, suspicion of which gives rise to constitutional rights not applicable to suspicion of criminal offenses. It seems to us that in so far. as suspicion of disloyalty has peculiarities which distinguish it from suspicions of bribery, seduction and other offenses, they are adverse to appellant's conclusions. We must look not only at appellant's but also at the public side of this controversy. From that point of view, the retention in the Government service of one suspected of theft or a similar offense would not be of great importance, and the revelation of the method of detection and the names of informants would probably not affect the public interest. But disloyalty in. the Government service under present circumstances is a matter of great public concern, and revelation of the methods of detecting it and of the names of witnesses involve public considerations of compelling importance.

We cannot ignore the world situation in which not merely two ideologies but two potentially adverse forces presently exist, and certainly we cannot require that the President and the Congress ignore it. Infiltration of government service is now a recognized technique for the overthrow of government. We do not think that the individual rights guaranteed by the Constitution necessarily mean that a govern-

69. United States ex rel. Taylor v. Taft, 1904, 24 App.D.C. 95, dismissed 1906, 203 U.S. 461, 27 S.Ct. 148, 51 L.Ed. 269; Caswell v. Morgenthau, 1938, 69 App.D.C. 15, 98 F.2d 296, certiorari denied 1938, 305 U.S. 596, 59 S.Ct. 81, 83 L.Ed. 378; Maghan v. Board of Com'rs of District of Columbia, 1944, 78 U.S.App.D.C. 370, 141 F.2d 274; Levine v. Farley, 1939, 70 App.D.C. 381, 107 F.2d 186, certiorari denied 1940, 308 U.S. 622, 60 S.Ct. 377, 84 L. Ed. 519; United States ex rel. Brown v. Lane, 1913, 40 App.D.C. 533, writ of error denied 1914, 232 U.S. 598, 34 S.Ct. 449, 58 L.Ed. 748.

70. United States ex rel. Taylor v. Taft supra note 69.

71. 1948, 84 U.S.App.D.C. 138, 171 F.2d 145, 146.

72. Eberlein v. United States, 1918, 53 Ct.Cl. 466, affirmed 1921, 257 U.S. 82, 42 S.Ct. 12, 66 L.Ed. 140.

73. Kent v. United States, 1946, 105 Ct.Cl. 280.

74. Golding v. United States, 1934, 78 Ct. Cl. 682, certiorari denied 1934, 292 U.S. 643, 54 S.Ct. 776, 78 L.Ed. 1494.

ment dedicated to those rights cannot preserve itself in the world as it is. This case presents a small segment of that momentous question. In the light of all that is well known,[75] much of which is recited in opinions of the Supreme Court,[76] we cannot say that a policy of caution in respect to members of the Communist Party in the Government service under current circumstances is forbidden by any restriction in the Constitution. The risks are for the President to estimate, and the assumption of risk is for him to decide. If he thinks that under present circumstances only those whose loyalty is beyond suspicion should be employed by this Government, the policy is his to make. The responsibility in this field is his, and the power to meet it must also be his. The judiciary cannot dictate that he must either retain in Government service those whom he reasonably suspects or else reveal publicly the means and methods by which he detects disloyalty.

Upon the contention that suspicion of disloyalty has characteristics distinguishing it from suspicion of other offenses, we conclude that the differences tend to solidify rather than to weaken the application of the doctrine that the President and the Congress are responsible for the qualifications, ability, judgment and loyalty of Government employees and that removal from Government employment is within their discretion.

*Conclusion.*

█ It is our clear opinion that the President, absent congressional restriction, may remove from Government service any person of whose loyalty he is not completely convinced. He may do so without assigning any reason and without giving the employee any explanatory notice. If, as a matter of policy, he chooses to give the employee a general description of the information which concerns him and to hear what the employee has to say, he does not thereby strip himself of any portion of his constitutional power to choose and to remove.

We conclude that the Executive Order before us and the proceedings under it violated no congressional limitation upon the executive power of removal; that no constitutional right was involved in this non-appointment or dismissal; and that, in so far as the circumstances imposed hardship upon the individual, the exigencies of government in the public interest under current conditions must prevail, as they always must when a similar clash arises.

Able pleas are made based upon the American passion for fair play and upon the sincere fears of patriotic men that unqueried and unrestricted power of removal in the President may lead to tyranny.[77] Such pleas are to be neither ignored nor belittled, but their forum is the Congress and the President's office. "The problem," as the executive director of the National Civil Service League has written,[78] is "not so much a matter of the legal issues involved as it is practical application of the President's loyalty review order and its administration."

Finding constitutional power for the procedure here followed, and no violation of congressional mandate, our function is exhausted. We have no concern with executive or legislative policy or with the processes by which those branches of the Gov-

75. Barsky v. United States, 1948, 83 U.S. App.D.C. 127, 167 F.2d 241, certiorari denied 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767 (pet. for rehearing pending).

76. Bridges v. Wixon, 1945, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103; Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; De Jonge v. Oregon, 1937, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Gitlow v. New York, 1925, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Stromberg v. California,

1931, 283 U.S. 359, 51 S.Ct. 532, 75 L. Ed. 1117, 73 A.L.R. 1484; Kessler v. Strecker, 1939, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082.

77. E. g., John Lord O'Brien, Loyalty Tests, 61 Harv.L.Rev. 592 (1948); Clifford J. Durr, The Loyalty Order's Challenge to the Constitution, 16 U. of Chi. L.Rev. 298 (1949).

78. H. Eliot Kaplan, Loyalty Review of Federal Employees, 23 N.Y.U.L.Q.Rev. 437, 446 (1948).

ernment fulfill their constitutional responsibilities.

The case will be remanded to the District Court with instructions to enter a decree holding invalid those sections of the orders of the Loyalty Boards and the Federal Security Agency which would bar Miss Bailey from employment for three years, and holding valid those sections which accomplished her removal from the rolls and from office in the classified civil service.

Reversed in part, affirmed in part, and remanded with instructions.

EDGERTON, Circuit Judge (dissenting).

Without trial by jury, without evidence, and without even being allowed to confront her accusers or to know their identity, a citizen of the United States has been found disloyal to the government of the United States.[1]

For her supposed disloyal thoughts she has been punished by dismissal from a wholly nonsensitive position in which her efficiency rating was high. The case received nation-wide publicity. Ostracism inevitably followed. A finding of disloyalty is closely akin to a finding of treason. The public hardly distinguishes between the two.

No charges were served on appellant. The chairman of the Regional Board said "Nobody has presented any charges." The Board told appellant it was inquiring whether there were reasonable grounds for believing she was disloyal to the government of the United States. The Federal Bureau of Investigation had reported that informants believed to be reliable had made general statements purporting to connect her with the Communist Party. These reports were not disclosed to the appellant and have not been disclosed in court. The informants were not identified to the appellant or even to the Board. Their statements were admittedly not made under oath. The appellant denied under oath any membership in and any relationship or sympathy with the Communist Party, any activities connected with it or with communism, and any affiliation with any organization that advocated overthrow of the government of the United States. She asserted her loyalty to the government of the United States. She admitted attending one Communist meeting in 1932 in connection with a seminar study of the platforms of the various parties while she was a student at Bryn Mawr.

Appellant had no power to subpoena witnesses. Though it takes courage to appear as a voluntary defense witness in a loyalty case, four appeared. One was the pastor of the Methodist church of which appellant is an active member. He testified: "When this charge or information came to me I was not only surprised, I was dumfounded. * * * People in our community and in our church think of her and her family in the highest terms." Three officials of appellant's government agency, the United States Employment Service, who had known appellant professionally and socially for years, testified respectively that they were "extremely shocked" by the suggestion of her being disloyal, that it was "inconceivable" and "out of reason". Persons prominent in business, government and education who knew appellant but could not be present submitted affidavits.

No witness offered evidence, even hearsay evidence, against appellant. No affidavits were introduced against her. The record consists entirely of evidence in her favor. Yet the Board purported to find "on all the evidence" that there were reasonable grounds for believing she was disloyal to the government of the United States. Appellees admit the Board made this finding "after considering all the evidence, including the confidential reports

1. The form of the finding against the appellant is that "reasonable grounds exist for belief" that she is disloyal to the government of the United States. The only important difference between this finding and a direct adjudication of disloyalty is that the former finding is easier to make. Once made, there is no practical difference. Executive Order 9835 recognizes this. In Part I, 2a it describes the form of finding prescribed in the Order and made here as an "adjudication of disloyalty"; in Part V, 2 as a "determination of disloyalty".

of the Federal Bureau of Investigation." The Board directed the Federal Security Agency to suspend appellant pending her appeal to the Loyalty Review Board, and told her she was barred from civil service examinations for three years.

Appellant appeared and testified before a panel of the Loyalty Review Board. She submitted her own affidavit and the affidavits of some 70 persons who knew her, including bankers, corporate officials, federal and state officials, union members, and others. Again no one testified against her. She proved she had publicly and to the knowledge of a number of the affiants taken positions inconsistent with Communist sympathies. She showed not only by her own testimony but by that of other persons that she favored the Marshall Plan, which the Communist Party notoriously opposed, and that in 1940, during the Nazi-Soviet Pact, she favored Lend-Lease and was very critical of the Soviet position. In her union she urged its officers to execute noncommunist affidavits, opposed a foreign policy resolution widely publicized as pro-Russian, and favored what was then the official CIO resolution on foreign policy.

Against all this, there were only the unsworn reports in the secret files to the effect that unsworn statements of a general sort, purporting to connect appellant with Communism, had been made by unnamed persons. Some if not all of these statements did not purport to be based on knowledge, but only on belief. Appellant sought to learn the names of the informants or, if their names were confidential, then at least whether they had been active in appellant's union, in which there were factional quarrels. The Board did not furnish or even have this information. Chairman Richardson said: "I haven't the slightest knowledge as to who they were or how active they have been in anything." All that the Board knew or we know about the informants is that unidentified members of

the Federal Bureau of Investigation, who did not appear before the Board, believed them to be reliable. To quote again from the record: "Chairman Richardson: I can only say to you that five or six of the reports come from informants certified to us by the Federal Bureau of Investigation as experienced and entirely reliable." "Mr. Seasongood: Here is a statement that it was ascertained you were a member of the Communist Party in the District of Columbia as early as 1935, and that in the early days of her Party membership she attended Communist Party meetings. * * * Here is another that says you were a member of the Communist Party, and he bases his statement on his knowledge of your association with known Communists for the past seven or eight years. That is part of the evidence that was submitted to us." "Mr. Porter: Is it under oath? Chairman Richardson: I don't think so. Mr. Seasongood: It is a person of known responsibility who had proffered information concerning Communist activity in the District of Columbia. * * * Here is another one: 'considers appointee a member of the Communist Party, and if not an actual member, one who is entirely controlled by the wishes of the Communist Leaders in the District of Columbia.'"

On such material, the Review Board sustained the action of the Regional Board and directed the Federal Security Agency to dismiss the appellant. However respectable her anonymous accusers may have been, if her dismissal is sustained the livelihood and reputation of any civil servant today and perhaps of any American tomorrow are at the mercy not only of an innocently mistaken informer but also of a malicious or demented one unless his defect is apparent to the agent who interviews him.

Appellant's dismissal violates both the Constitution and the Executive Order.[2]

2. The Boards that dismissed the appellant are agencies of the Civil Service Commission. Before their proceedings took place, the appellant had been reinstated in her permanent position in the classified civil service from which she had previously been separated by a reduction in force. Therefore both the Lloyd-LaFollette Act, 37 Stat. 555, § 6, 5 U.S.C.A. § 652, and the Executive Order, Part I, 1 and Part II, preclude the Civil Service Commission, or any

I. *Executive Order 9835*[3] *requires evidence and an opportunity for cross-examination.* The Executive Order provides that "The standard for the refusal of employment or the removal from employment in an executive department or agency on grounds relating to loyalty shall be that, on all the evidence, reasonable grounds exist for belief that the person involved is disloyal to the Government of the United States."[4] Despite the plain words "all the evidence", the court rules that the Order requires no evidence and authorizes findings based on unsworn confidential reports of unsworn statements of anonymous informants as to their beliefs concerning an employee's affiliations. I think the Order does no such thing.

The court derives its paradoxical conclusion from premises that do not support it. The court points out that the Order and a supplementary order require the names of confidential informants, and reports of the proceedings, to be kept confidential. But no order requires the Board to consider only confidential information. To say that confidential informants shall not be disclosed is not to say that willing government witnesses shall not be heard or that findings may be made without evidence. Neither is the prohibition against publication of reports a prohibition against hearing witnesses. On the contrary, Executive Order 9835 expressly authorizes testimony by witnesses for the accused employee.[5] If anything so unprecedented as a prohibition of testimony by witnesses for the government had been intended it would have been plainly expressed. Unsworn anonymous statements may be used and useful as leads to evidence but not as substitutes for evidence.

The requirement of the Order that findings be based on evidence is not merely uncontradicted by the context. It is confirmed by the context. The preamble of the Order says that both the United States and the accused employee must be afforded "maximum protection."[6] Such protection plainly includes an opportunity to introduce witnesses and to cross-examine opposing witnesses. Even the minimum standards of fairness that are known as due process of law include as much. Hardly any protection at all is possible against vague assertions of unseen and unknown persons. The accused employee can only deny such assertions and prove, as the appellant did, that they are inconsistent with her reputation and with some of her acts. She can prove no specific contradictions, no mistaken identities, and no alibis, for she cannot discover just when and where she is supposed to have done or said anything. However prejudiced, mistaken, untruthful, delinquent, or defective her accusers might prove to be if they could be cross-examined, an unidentified agent's recorded belief in the reliability of their reports and inferences must go unchallenged. "The many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of Cross-examination * * * It is beyond any doubt the greatest legal engine ever invented for the discovery of truth."[7]

Moreover the Order provides that "an officer or employee who is charged with being disloyal shall have a right to an administrative hearing * * *."[8] Particularly in the light of the guarantee of maximum protection, this must mean a full administrative hearing. Even a normal administrative hearing, to say nothing of one that affords maximum protection, includes the right of confrontation and cross-examination and the requirement that findings

---

administrative agency other than the one in which she worked, from interfering with her tenure.

3. 12 Fed.Reg. 1935.

4. Part V, 1.

5. Part II, 2a.

6. "Whereas maximum protection must be afforded the United States against in-

filtration of disloyal persons into the the ranks of its employees, and equal protection from unfounded accusations of disloyalty must be afforded the loyal employees of the Government:"

7. Wigmore, Evidence, §§ 1362, 1367, (3d ed. 1940).

8. Part II, 2a.

be based on evidence. Evidence has been required in administrative hearings even where, as here, the substantive matter at stake may be considered a privilege rather than a right. Aliens are entitled to a fair hearing in deportation proceedings, and this despite the fact that "there is no express requirement for any hearing or adjudication in the statute authorizing deportation." [9] Even in deportation proceedings against aliens charged with advocating, or with membership in organizations advocating, overthrow of the government by force, evidence is required. The Supreme Court has said in such cases: "If the hearing was fair, if there was evidence to support the finding of the Secretary, and if no error of law was committed, the ruling of the Department must stand and cannot be corrected in judicial proceedings. If, on the other hand, one of the elements mentioned is lacking, the proceeding is void and must be set aside." [10] "The ultimate question presented by this record * * * is whether the warrant of deportation was supported by any evidence that the alien when he entered the United States advocated opposition to all organized government or the overthrow of the United States government by force and violence * * *." [11] "Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. * * * Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." [12] It follows that even if the Executive Order did not expressly require findings based on evidence, or promise maximum protection, the administrative hearing which the Order guarantees to the employee whose job and reputation are at stake would still require evidence and an opportunity for cross-examination. As the Supreme Court has said, "manifestly there is no hearing when the party does not know what evidence is offered or considered, and is not given an opportunity to test, explain, or refute." [13]

No doubt cases arise in which investigation of an employee produces only anonymous accusations. The Executive Order elects to preserve their anonymity. No one questions the validity of that election. But its effect is that the employee must be cleared or the proceedings dropped.[14] The Executive Order does not, and could not constitutionally, provide that he may be found disloyal without evidence.

II. *Dismissal for disloyalty is punishment and requires all the safeguards of a judicial trial.* Most dismissals, including among others dismissals for colorless or undisclosed reasons and dismissals for incompetence, are plainly not punitive. They do not require a judicial trial or even a full administrative hearing. They are within the authority of the executive. Likewise most tax laws are within the authority of the legislature. It does not follows that all legislative taxation is constitutional or that all executive dismissals are constitutional.

Punishment is infliction of harm, usually for wrong conduct but in appellant's case for wrong views. Dismissals to provide jobs for persons of certain affiliations, whatever else may be said of such dismissals, are not punitive. But dismissals for disloyal views are punitive. This is what the Supreme Court squarely held in the Lovett case.[15] It overruled no cases in so holding. The earlier decisions of the Supreme Court

9. Wong Yang Sung v. McGrath, 339 U.S. 33, 48, 70 S.Ct. 445, 453.

10. Kessler v. Strecker, 307 U.S. 22, 34, 59 S.Ct. 694, 700, 83 L.Ed. 1082.

11. United States ex rel. Vajtauer v. Com'r of Immigration, 273 U.S. 103, 106, 47 S.Ct. 302, 304, 71 L.Ed. 560.

12. Bridges v. Wixon, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103.

13. Interstate Commerce Commission v. Louisville & Nashville Railroad, Co., 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 431. The Massachusetts Supreme Court has quoted this statement in reviewing the dismissal of a school principal by a board of education. Moran v. School Committee of Littleton, 317 Mass. 591, 594–595, 59 N.E.2d 279, 281.

14. Cf. United States v. Grayson, 2 Cir., 166 F.2d 863, 870.

15. United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252.

on which this court relies are irrelevant because they involved dismissals for undisclosed reasons, not for disloyal views.

The question whether the rule of the Lovett case extends to dismissals of "disloyal" persons from sensitive positions in which their presence might threaten substantial harm to the government does not arise in the present case and I express no opinion on it. Appellant was dismissed from a nonsensitive position. She was a staff training officer in the United States Employment Service. In the case of such an officer, no way is apparent and none has been suggested in which "suspicion of disloyalty indicates a risk" to the security of the United States. *Appellant's dismissal for wrong thoughts has nothing to do with protecting the security of the United States.*

Congress attempted to dismiss Lovett and two others from their government positions as of November 15, 1943, because of their supposed disloyal views. Their agencies kept them at work on their jobs for varying periods after November 15 but discontinued their salaries after that date. They sued for and recovered salaries for their post-November 15 work. The Supreme Court held that their dismissals for supposed disloyalty, "which stigmatized their reputation and seriously impaired their chance to earn a living," [16] were equivalent to punishment for crime and therefore could not be imposed by Congress or without judicial trial. The validity of an incidental attempt of Congress to make them ineligible for possible future appointments was not the question before the Court. They did not ask for, and it does not even appear that they would have been willing to accept, either reinstatement in their old positions or appointments to new positions. The Court *said* "This permanent proscription from any opportunity to serve the Government is punishment * * *." [17] But the question before the Court was whether the attempted dismissals were valid. This was the question the Court *decided.*

This court is deciding this case as if the Supreme Court had sustained the attempt of Congress to dismiss Lovett and the others, denied their claims to salaries, and awarded them nothing but an assurance that they would be eligible for possible future appointments if they were ever offered any that they cared to accept. This court interprets the *words* of the Supreme Court regarding "permanent proscription" as contradicting and overruling the *decision* of the Supreme Court regarding dismissals. If the Court's words had been inconsistent with its decision our duty would of course have been to follow the decision, not the words. But they were not inconsistent. The dismissals that the Court held invalid were the immediate phase of the permanent proscription that the Court said was invalid.

The distinction this court draws between dismissal as punishment and ineligibility as punishment not only contradicts the Lovett case but has no basis in reason. Dismissal is more certainly damaging than ineligibility, for the necessary combination of vacancies, qualifications, and desire for public appointment may never occur again. A person dismissed as disloyal can obtain no normal employment, public or private. The President's Committee on Civil Rights said in 1947: "It is a severe punishment to be discharged from the government for disloyalty, as the Supreme Court pointed out in 1946 in United States v. Lovett. * * * Loss of job and inability to obtain another one is a severe punishment to impose on any man." [18] It makes no present or probable future difference to the appellant and it should make no difference to a court whether the appellant is told that she is separated from the civil service for life, for three years, or only for the moment. Whatever she is told, if her dismissal is sustained she will not be reemployed while the present climate of opinion continues.

Since dismissal from government service for disloyalty is punishment, due process of law requires that the accused employee be given all the safeguards of a judicial trial before it is imposed. The Supreme Court in the Lovett case did not stop with

16. 328 U.S. at page 314, 66 S.Ct. at page 1078.

17. 328 U.S. at page 316, 66 S.Ct. at page 1079.

18. To Secure These Rights, p. 51

holding that *Congress* could not dismiss employees for disloyalty. It went on to say, with particular reference to this punishment: "Those who wrote our Constitution * * * intended to safeguard the people of this country from punishment without trial by duly constituted courts. * * * And even the courts to which this important function was entrusted were commanded to stay their hands until and unless certain tested safeguards were observed. An accused in court must be tried by an impartial jury, * * * he must be clearly informed of the charge against him, the law which he is charged with violating must have been passed before he committed the act charged, he must be confronted by the witnesses against him * * * and even after conviction no cruel and unusual punishment can be inflicted upon him." [19]

Not only the basic right to judicial trial but every one of these basic safeguards, unless it be the last, was violated here.[20] (1) The appellant was not tried by a jury. (2) She was not clearly informed of the charge against her. This is true not only because there was no formal charge and, according to the Chairman of the Regional Board, no charge at all, but also because of the vagueness of the term "disloyal". It is so indefinite that neither the Executive Order nor, as far as appears, the Loyalty Review Board has attempted to define it. It means different and sometimes opposite things to different people. Since section 9A of the Hatch Act[21] forbids employment of members of an organization that advocates (and, by necessary implication, of persons who advocate) "the overthrow of our constitutional form of government in the United States," the Executive Order is plainly meant to cover more ground, but how much more no one can say. As the Supreme Court has repeatedly held, very indefinite standards cannot be used as a basis for punishment. (3) The appellant violated no law. (4) Even the Executive Order was issued after the activities from which her disloyalty is inferred took place, if they took place at all. (5) She was not confronted with any witnesses against her. (6) Forced idleness may well be considered a cruel as well as unusual punishment. It has been considered more severe than forced labor.

Because certain officials should be free from apprehension that personal harm to them may result from their official acts they cannot, as the court points out, be required to pay damages for their official errors. But that is irrelevant here. The present appellant asks compliance with the Constitution, not damages for its violation. "Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, * * the courts have the power to grant relief against those actions."[22]

III. *Appellant's dismissal abridges freedom of speech and assembly.*[23] Mr. Justice Holmes' famous statement, made in 1892 when he was a member of the Supreme Judicial Court of Massachusetts, that "the petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman"[24] is greatly oversimplified. "As pointed out in Frost v. Railroad Comm., 271 U.S. 583, 594, 46 S.Ct. 605, 607, 70 L.Ed. 1101 [47 A. L.R. 457], even in the granting of a privilege, the state 'may not impose conditions which require the relinquishment of consti-

---

19. 328 U.S. at pages 317–318, 66 S.Ct. at page 1079.

20. The Supreme Court named additional safeguards, including the right to counsel, which I have omitted from the quotation because they were not violated here.

21. 53 Stat. 1148, 5 U.S.C.A. 118j.

22. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 1468.

23. Read literally, the First Amendment forbids only *Congress* to abridge these freedoms, but as the due process clause of the Fourteenth Amendment extends the prohibition to all state action the due process clause of the Fifth must extend it to all federal action. Cf. United Public Workers v. Mitchell, 330 U.S. 75, 94–95, 67 S.Ct. 556, 91 L.Ed. 754.

24. McAuliffe v. City of New Bedford, 155 Mass. 216, 220, 29 N.E. 517.

tutional rights. * * *'"[25] including the rights of free speech, press, and assembly. In the Esquire case the Supreme Court said: "We may assume that Congress * * * need not open second-class mail to publications of all types. * * * But grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever. See the dissents of Mr. Justice Brandeis and Mr. Justice Holmes in Milwaukee Publishing Co. v. Burleson, 255 U.S. 407, 421-423, 430-432, 437-438 [41 S.Ct. 352, 65 L.Ed. 704]. Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated."[26] Similarly, the premise that government employment is a privilege does not support the conclusion that it may be granted on condition that certain economic or political ideas not be entertained. Though members of minority parties have often been dismissed, in the past, to make room for members of a party in power, any comprehensive practice of that sort would today be unthinkable as well as illegal, and the Supreme Court has plainly indicated it would also be unconstitutional. The Court pointed out in the Mitchell case that Congress could not "'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work.'"[27]

The dismissal which the Court upheld in the Mitchell case was not based on views but on conduct. The Hatch Act sought to restrain civil servants, regardless of their views, from devoting more than a limited amount of energy to politics. The Court held that "For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service."[28] Since the present appellant was not a policy-making officer, had no access to state secrets, and was not even in a sensitive agency, it is doubtful whether any political opinions of hers, however obnoxious, could reasonably be deemed to interfere with the efficiency of the service. But the question is, I think, immaterial here, for the "vague and indeterminate * * * boundaries"[29] of the term "disloyal" have made the Executive Order as construed and applied a restraint on many opinions that certainly cannot be deemed to interfere with the efficiency of the service.

"In loyalty hearings the following questions have been asked of employees against whom charges have been brought. * * * 'Do you read a good many books?' 'What books do you read?' 'What magazines do you read?' 'What newspapers do you buy or subscribe to?' 'Do you think that Russian Communism is likely to succeed?' 'How do you explain the fact that you have an album of Paul Robeson records in your home?' 'Do you ever entertain Negroes in your home?' * * * 'Is it not true * * * that you lived next door to and therefore were closely associated with a member of the I.W.W.?'"[30] "Too often the line of questioning has revolved around conformity with prevailing mores in personal habits and personal opinion. * * * A woman employee was accused of disloyalty because, at the time of siege of Stalingrad, she collected money for Russian war relief (she also collected money for British

25. Alston v. School Board of City of Norfolk, 4 Cir., 112 F.2d 992, 997. The court also cited Union Pac. R. Co. v. Public Service Comm., 248 U.S. 67, 69, 70, 39 S.Ct. 24, 63 L.Ed. 131, and Hanover Fire Ins. Co. v. Harding, 272 U.S. 494, 507, 47 S.Ct. 179, 71 L.Ed. 372, 49 A.L.R. 713. Cf. Western Union Tel. Co. v. Kansas, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355; Terral v. Burke Construction Co., 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352, 21 A.L.R. 186.

26. Hannegan v. Esquire, Inc., 327 U.S. 146, 155, 156, 66 S.Ct. 456, 461, 90 L.Ed. 586.

27. United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 569.

28. Id. at 101, 67 S.Ct. at page 570.

29. Herndon v. Lowry, 301 U.S. 242, 264, 57 S.Ct. 732, 742, 81 L.Ed. 1066.

30. Freedom vs. Security, by Robert E. Cushman, Goldwin Smith Professor of Government in Cornell University; in Physics Today, March 1949, pp. 14, 18.

and French relief)."[31] A record filed in this court shows that an accused employee was taken to task for membership in Consumers Union and for favoring legislation against racial discrimination. The record in the present case contains the following colloquy between a member of the Regional Board and the present appellant: "Mr. Blair: Did you ever write a letter to the Red Cross about the segregation of blood? Miss Bailey: I do not recall. Mr. Blair: What was your personal position about that? Miss Bailey: Well, the medical—. Mr. Blair: I am asking yours."[32]

No doubt some boards are quite aware that unconventional views and conduct have no tendency to indicate disloyalty. But the fact remains that some boards imagine the contrary. This fact is only too well known. It puts government employees under economic and social pressure to protect their jobs and reputations by expressing in words and conduct only the most orthodox opinions on political, economic, and social questions.

A regulation that restrains constitutionally protected speech along with other speech cannot be enforced against either. Legislation is unconstitutional as a whole if it "does not aim specifically at evils within the allowable area of state control, but * * * sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press. The existence of such a statute * * * results in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview. * * * An ac-

cused * * * under such a statute, does not have to sustain the burden of demonstrating that the State could not constitutionally have written a different and specific statute covering his activities as disclosed by the charge and the evidence introduced against him. * * * Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression."[33]

The Supreme Court has foreseen practically the case now before us. In holding a New York statute unconstitutional the Court said: "The present case as to a vague statute abridging free speech involves the circulation of only vulgar magazines. The next may call for decision as to free expression of political views in the light of a statute intended to punish subversive activities."[34]

Freedoms that may not be abridged by law may not be abridged by executive order. Executive power to control public employment stands on no higher constitutional ground than legislative power to tax. The taxing power does not extend to sales of propaganda not made for profit; license taxes, though imposed for the legitimate purpose of raising revenue, are unconstitutional in their application to such sales.[35] Such taxes, even if they are too small to be a "substantial clog"[36] on the circulation of propaganda, are "on their face * * * a restriction of the free exercise of those freedoms which are protected by the First

---

31. Editorial in The Washington Post, Feb. 6, 1949.

32. Miss Bailey replied "I have no personal opinion."

33. Thornhill v. Alabama, 310 U.S. 88, 97–98, 68 S.Ct. 736, 742, 84 L.Ed. 1093.

34. Winters v. New York, 333 U.S. 507, 518, 68 S.Ct. 665, 671, 92 L.Ed. 840.

35. Jones v. City of Opelika, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290; Murdock v. Commonwealth of Pennsylvania, 319

U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81; Busey v. District of Columbia, 319 U.S. 579, 63 S.Ct. 1277, 87 L.Ed. 1598; Busey v. District of Columbia, 78 U.S.App.D.C. 189, 138 F.2d 592.

36. Jones v. City of Opelika, 316 U.S. 584, 604, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514. The dissent of Chief Justice Stone and the other dissents filed at the same time were afterwards adopted as opinions of the Court. Jones v. City of Opelika, 319 U.S. 103, 104, 63 S.Ct. 890, 87 L.Ed. 1290.

Amendment."[37] The loss of employment, reputation, and earning power here involved is on its face a very substantial clog on the free exercise of those protected freedoms. It is therefore more clearly unconstitutional than the taxes.

Appellant's dismissal abridges not only freedom of speech but freedom of thought. Whatever disloyalty means in the present connection, it is not speech but a state of mind. The appellant was dismissed for thinking prohibited thoughts. A constitution that forbids speech control does not permit thought control.

Appellant's dismissal attributes guilt by association, and thereby denies both the freedom of assembly guaranteed by the First Amendment and the due process of law guaranteed by the Fifth. The appellant was dismissed as disloyal because she was believed to be a member or associate of the Communist Party. Undoubtedly many such persons are disloyal in every sense to the government of the United States. But the Supreme Court has held that a particular member of the Communist Party may be "attached to the principles of the Constitution" within the meaning of those words in a naturalization act: "As Justice Holmes said, 'Surely it cannot show lack of attachment to the principles of the Constitution that * * * [one] thinks it can be improved.' * * * 'If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate.'" "Under our traditions beliefs are personal and not a matter of mere association, and * * *

men in adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles."[38] As was said more recently, "To condemn or to interdict all members of a named political party is an abridgement of free speech, press and assembly. The Communist Party in this country is recognized as a political party."[39]

The court thinks Miss Bailey's interest and the public interest conflict. I think they coincide. Since Miss Bailey's dismissal from a nonsensitive job has nothing to do with protecting the security of the United States, the government's right to preserve itself in the world as it is has nothing to do with this case. The ominous theory that the right of fair trial ends where defense of security begins is irrelevant.

On this record we have no sufficient reason to doubt Miss Bailey's patriotism, or that her ability and experience were valuable to the government. We have no reason to suppose that an unpatriotic person in her job could do substantial harm of any kind. Whatever her actual thoughts may have been, to oust her as disloyal without trial is to pay too much for protection against any harm that could possibly be done in such a job. The cost is too great in morale and efficiency of government workers, in appeal of government employment to independent and inquiring minds, and in public confidence in democracy. But even if such dismissals strengthened the government instead of weakening it, they would still cost too much in constitutional rights. We cannot preserve our liberties by sacrificing them.

37. Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 114, 63 S.Ct. 870, 875, 87 L.Ed. 1292, 146 A.L.R. 81.

38. Schneiderman v. United States, 320 U.S. 118, 138, 136, 63 S.Ct. 1333, 1342, 1343, 87 L.Ed. 1796.

39. Prettyman, Circuit Judge, dissenting, in National Maritime Union of America v. Herzog, D.C., 78 F.Supp. 146, 177,

178. The Supreme Court affirmed the decision of the court on other grounds, saying: "We do not find it necessary to reach or consider the validity of § 9 (h)" of the National Labor Relations Act as amended, 29 U.S.C.A. § 159(h), which requires non-Communist affidavits. National Maritime Union of America v. Herzog, 334 U.S. 854–855, 68 S.Ct. 1529, 92 L.Ed. 1776.