# Damages and Arbitration Provisions in Proposed Amendments to the Fair Housing Act

Certain proposed amendments to the Fair Housing Act would provide that parties may voluntarily submit their dispute to an arbitrator empowered to impose compensatory and punitive damages (as opposed to equitable relief or restitution). These amendments would be permissible under the Seventh Amendment because they amount to a waiver of a right, that would otherwise obtain, to a jury trial on compensatory and punitive damages. The amendments also comport with the strictures of Article III. The Supreme Court has held that Article III strictures cannot be waived, but the Court also has found that purely voluntary procedures severely minimize any Article III concerns.

Other aspects of the proposed amendments to the Fair Housing Act, which authorize mandatory proceedings before an arbitrator or administrative law judge with the power to award compensatory and punitive damages, would likely not survive scrutiny under the Seventh Amendment and Article III. The cause of action created by the Fair Housing Act appears to be derived from a common law action that is historically within the exclusive preserve of Article III courts operating with a jury. Furthermore, the right at issue is private in nature, in that it is intended to determine the liability of one individual to another. In addition, the housing market is not a specialized area of administrative regulation by the Federal Government. Finally, the Fair Housing Act setting does not seem to involve an imperative necessity for Congress to choose an administrative remedy, as demonstrated by the fact that judicial proceedings would remain available to plaintiffs and there would be only minimal differences in the relief available in the administrative and judicial forums. Under the Supreme Court's admittedly confusing and inconsistent precedents, these factors suggest that the proposed mandatory administrative proceedings would not comport with Article III or the Seventh Amendment.

June 8, 1987

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CIVIL RIGHTS DIVISION

This responds to your request for our opinion on the Seventh Amendment issues raised by the use of civil penalties and punitive damages in proposed amendments to the Fair Housing Act, 42 U.S.C. §§ 3602–3631. The Civil Rights Division has drafted a bill entitled "Fair Housing Amendments Act of 1987" (draft bill), while the Senate is considering S. 558.

The draft bill and S. 558 raise three questions. First, may an arbitrator award anything other than equitable relief in a voluntary arbitration proceeding? Second, is the defendant in a civil action entitled to a jury trial on the issue of liability for civil penalties? Third, may an arbitrator or an administrative law judge award compensatory damages, punitive damages, or civil penalties in an administrative proceeding?

# I. Analysis

## A. *Punitive Damages in Voluntary Arbitration*

The first question is whether an arbitrator may award damages in a voluntary proceeding under § 812 of the draft bill. The bill would permit the parties to agree to voluntary arbitration that would be binding on the parties. § 812(a)(2).[1] There is certainly no impediment to the arbitrator in such a voluntary proceeding imposing the equitable relief now outlined in the draft bill: a permanent or temporary injunction and restitution. Nor do we believe that the Seventh Amendment precludes the parties from agreeing voluntarily to submit their dispute to an arbitrator who could impose punitive damages. In these circumstances, both parties will have waived any Seventh Amendment rights that would otherwise obtain.

The question whether this proceeding is consistent with Article III of the Constitution is somewhat more problematic. The voluntary participation of private litigants in a proceeding outside the confines of the federal judiciary does not *ipso facto* insulate it from Article III attack. *Commodities Futures Trading Comm'n* v. *Schor*, 478 U.S. 833, 851–54 (1986). The Court in *Schor* emphasized that the strictures of Article III (unlike the protection of Seventh Amendment) cannot be waived by the consent of the parties. *Id.* For the reasons discussed more fully below, however, we believe that the arbitration proceeding contemplated in § 812 of the draft bill would survive Article III scrutiny because a very similar administrative scheme was upheld in *Schor* primarily because of its voluntary nature. *Id.* at 856–57.

## B. *Jury Trial in a Civil Action*

On the issue of liability for punitive damages, we believe that the Seventh Amendment entitles the defendant to a jury trial in a civil action under either § 814(c) of the draft bill or § 813 of S. 558.

The Supreme Court has held that suits by the Government to recover civil penalties are analogous to a common law action in debt, an action covered by the Seventh Amendment's requirement of a jury trial. *Tull* v. *United States*, 481 U.S. 412, 420–23 (1987). Therefore, the defendant in an action to recover a civil penalty under the Clean Water Act, 33 U.S.C. § 1319(d), is entitled to a jury trial. The Court distinguished between actions at law, which are covered by the Seventh Amendment, and actions in equity, which are not.[2] *Tull*, 481 U.S. at 416. Noting that civil penalties were punitive in nature, and were intended to do more than make the offender disgorge unlawful profits, the Court in *Tull* observed:

---

[1] Section 812(a)(4), although incomplete, supports our assumption that the hearing will be conducted according to rules that provide for presentation of witnesses and evidence so as to satisfy any due process concerns.

[2] Actions at equity include temporary and permanent injunctions and orders, such as reparations, that restore the *status quo*.

51

> A civil penalty was a type of remedy at common law that could only be enforced in courts of law. Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity.

*Id.* at 422. The Court analyzed the legislative history of the Clean Water Act's penalty provision and determined that it was intended to punish offenders and therefore reflected "more than a concern to provide equitable relief." *Id.* "Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties." *Id. Tull* therefore stands for the proposition that civil penalties that are designed to punish are actions at law that must be tried to a jury under the Seventh Amendment. *See also Curtis* v. *Loether*, 415 U.S. 189, 194 (1974). The determination in a civil action of liability for "punitive damages" thus requires a trial by jury. Punitive damages are designed to punish and were, not surprisingly, identified by the Court as another kind of action at law that requires a jury trial. *Tull*, 481 U.S. at 422 n.7. Therefore, a defendant in an action brought under § 814(c) of the draft bill or § 813 of S. 558 would be entitled to a jury trial.

Moreover, even if civil penalties or punitive damages were not available, a jury trial would still be required so long as a private litigant could recover actual, compensatory damages. The Court in *Curtis*, noting that "[a] damages action sounds basically in tort," held that a suit by an aggrieved person to collect damages under § 812 of the Fair Housing Act required a trial by jury. 415 U.S. at 194–95.

## C. Seventh Amendment and Article III: Permissibility of Mandatory Arbitration

Having concluded that an action for compensatory or punitive damages would require a jury trial in an Article III court, we turn to the most difficult question posed by the draft bill and S. 558: whether providing precisely the same cause of action in an administrative tribunal where no jury is available can survive constitutional scrutiny under the Seventh Amendment and Article III.

### 1. Case Law

The Supreme Court has held that the Seventh Amendment does not prohibit Congress from assigning adjudication of certain statutory rights to an administrative forum, even if a jury would have been required under the Seventh Amendment had Congress assigned adjudication of the same rights to a federal court: *Atlas Roofing Co.* v. *Occupational Safety & Health Comm'n*, 430 U.S. 442, 450 (1977):

At least in cases in which "public rights" are being litigated —
*e.g.*, cases in which the Government sues in its sovereign capac-
ity to enforce public rights created by statutes within the power
of Congress to enact — the Seventh Amendment does not
prohibit Congress from assigning the factfinding function and
initial adjudication to an administrative forum with which the
jury would be incompatible.

*See also Tull*, 481 U.S. at 418 n.4; *NLRB* v. *Jones & Laughlin Steel Corp.*, 301
U.S. 1 (1937); *Block* v. *Hirsh*, 256 U.S. 135 (1921). The Court made clear,
however, that actions involving "private rights" as distinguished from "public
rights" could not be transferred to administrative proceedings:

Our prior cases support administrative factfinding in only those
situations involving "public rights," *e.g.*, where the Government
is involved in its sovereign capacity under an otherwise valid
statute creating enforceable public rights. Wholly private tort,
contract, and property cases, as well as a vast range of other
cases are not at all implicated.

*Atlas Roofing*, 430 U.S. at 458.[3]

The problem is that the Court has never stated with any clarity what distin-
guishes a public right from a private right.[4] "The distinction between public
rights and private rights has not been definitively explained in [the Court's]
precedents." *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458
U.S. 50, 69 (1982) (plurality opinion). But while the Court's application of the
public rights doctrine has not been particularly consistent or coherent, the
conceptual underpinnings of this theory are reasonably discernible.

Essentially, the public rights doctrine reflects the Court's recognition that
the nature and historical backdrop of the federal right at issue are quite
significant in determining whether congressional substitution of alternative
tribunals for Article III courts impermissibly encroaches on the independence
and authority of the federal judiciary. At one end of the spectrum, the Court has
sought to prevent Congress from usurping the constitutional prerogatives of
courts and, in some circumstances, juries, by removing from Article III tribu-

---

[3] *Tull* does not diverge from this line of cases. In a footnote, the majority stated:
The Court has also considered the practical limitations of a jury trial and its functional compat-
ibility with proceedings outside of traditional courts of law in holding that the Seventh Amend-
ment is not applicable to administrative proceedings. But the Court has not used these consider-
ations as an independent basis for extending the right to a jury trial under the Seventh Amendment.
481 U.S. at 418 n.4 (citing *Atlas Roofing* and *Pernell* v. *Southall Realty*, 416 U.S. 363 (1974)). We are not
certain what these two sentences mean. At a minimum, however, they indicate that *Tull* is not meant to signal
a reexamination of the principles underlying *Atlas Roofing*.

[4] We believe the public rights doctrine is primarily based on Article III principles and thus will discuss this
issue principally in those terms. The conclusion that a right is "public" for Article III purposes would seem to
subsume any Seventh Amendment objections on this basis. *Cf. Atlas Roofing*, 430 U.S. at 456; *Northern
Pipeline*, 458 U.S. at 67 n.18. In any event, in analyzing the public rights doctrine, the Court has treated the
constraints of the Seventh Amendment and Article III as virtually coextensive, discussing and citing Seventh
Amendment and Article III cases interchangeably.

nals matters which the Constitution's text, structure and history suggest are theirs to resolve. At the other end of the spectrum, the Court has perceived no plausible threat to an independent judiciary or trial by jury from non-Article III resolution of matters that are committed by the Constitution or historical consensus to political branches, and which thus "could have been determined exclusively" by the executive and legislative branches absent any judicial review save that required by the Due Process Clause.[5] *Northern Pipeline*, 458 U.S. at 68 (plurality opinion) (citing *Crowell* v. *Benson*, 285 U.S. 22 (1932)). In short, the dividing line that has emerged from the Court's precedent is that cases which are "inherently . . . judicial," *Ex parte Bakelite Corp.*, 279 U.S. 438, 458 (1929), because they involve traditional rights governing "the liability of one individual to another," *Crowell*, 285 U.S. at 51, may not be removed from adjudication in the federal courts absent extraordinary circumstances, while those involving disputes "between the government and others" may permissibly be committed to agency adjudication. *Ex parte Bakelite Corp.*, 279

---

[5] This and similar phrases, often repeated but rarely explained by the Court, apparently refer to those matters that the political branches could have disposed of in a summary fashion before the evolution of modern substantive and procedural due process theories. This would include those areas where the text of the Constitution grants plenary authority to one of the political branches — such as immigration or taxation — and disputes concerning the removal of "privileges" such as Government financial assistance, rather than "rights" as traditionally understood. "The understanding of these cases is that the Framers expected that Congress would be free to commit such matters completely to non-judicial executive determination, and that as a result there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative agency." *Northern Pipeline*, 458 U.S. at 68 (plurality opinion). *See also Crowell* v. *Benson*, 285 U.S. at 50, *Thomas* v. *Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 596–97 n.1 (1985) (Brennan, J., concurring). Moreover, "[t]his doctrine may be explained in part by reference to the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its consent to be sued " *Northern Pipeline*, 458 U.S. at 67. *See also Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 283–85 (1856); *Ex parte Bakelite Corp.*, 279 U.S. 438, 452 (1929). In other words, the original Article III cases seem to be premised on concepts akin to the "bitter with the sweet" theory of procedural due process and the "right/privilege" distinction. *See Arnett* v. *Kennedy*, 416 U.S. 134 (1974); *Bailey* v. *Richardson*, 182 F.2d 46 (1950), *aff'd*, 341 U.S. 918 (1951). That is, the Government could condition suit against itself on the plaintiff's waiver of any right to choose a forum or a jury trial, and in connection with exercising plenary grants of authority or limiting financial benefits, the political branches were fully free to dispose of government-created entitlements without providing any means of contesting such summary action.

Of course, as a due process matter, subsequent case law has undermined these conceptual underpinnings. It is now clear that there is a property interest in Government entitlements, a substantive due process right against arbitrary or capricious government practices, and a prohibition against conditioning the extension of Government benefits on the waiver of constitutional rights. *See, e.g., Goldberg* v. *Kelly*, 397 U.S. 254 (1970); *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532 (1985); *Speiser* v. *Randall*, 357 U.S. 513 (1958). Nevertheless, for Article III purposes, we believe these concepts help to describe what is meant by matters which "could be conclusively determined" by the executive and legislative branches. The notion is that traditional, private state law claims antedating the newly created federal statutory rights are the type that should remain within the province of Article III courts. These rights do not exist *solely* by virtue of the federal statutory scheme, do not involve disputes between a private individual and the Government *qua* Government, and do not concern alleged deprivations caused by the Government's administration of its own regulatory or financial assistance schemes. Accordingly, even under a "consent to suit" or "bitter with the sweet" theory, such matters would not be subject to summary disposition by the political branches because they involve traditional disputes solely between private individuals and would thus fall outside the rationale supporting the earlier Article III cases. Again, the rise of modern due process theory should not affect the Article III analysis. That recent due process cases create checks against the Government's power to engage in summary disposition of certain matters does not provide a rationale supporting the non-Article III adjudication of matters *not* previously subject to summary disposition.

U.S. at 451. Although the Court has not comprehensively or even consistently defined this concededly abstract line of demarcation, it has identified the factors that tend to differentiate public from private rights.

Probably the most important factor in defining the nature of the federal right presented is the historical underpinnings of the right. If the claim at issue is analogous to "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," there is at least a strong presumption that it must be resolved by an Article III court. *Northern Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring). Although the *Northern Pipeline* plurality and some earlier cases seem to hold that Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty, *Northern Pipeline*, 458 U.S. at 67 (plurality opinion) (quoting *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)), the Court's recent decisions seemingly conclude that the traditional common law attributes of a claim do not, standing alone, prohibit such a withdrawal. Nevertheless, even these recent decisions have emphasized that such traditional legal and equitable causes of action are at the "protected core" of Article III judicial powers. *Thomas* v. *Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 587 (1985). *See also Schor*, 478 U.S. at 853. As the Court put it in *Schor*, "the state law character of a claim is significant for purposes of determining the effect that an initial adjudication of those claims by a non-Article III tribunal will have on the separation of powers for the simple reason that private, common law rights were historically the types of matters subject to resolution by Article III courts." *Id.* at 854.[6]

Accordingly, if Congress creates a statutory cause of action, the roots of which can fairly be traced to a traditional legal *or equitable* claim, there is a heavy, albeit rebuttable, presumption that the claim may not be delegated to administrative adjudication.[7]

Conversely, "matters arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments,' [and] matters that historically could have been determined exclusively by those departments" are clearly

---

[6] The Court has emphasized that the historical antecedents of a particular right, not an objective evaluation of whether it is of the sort that *should* be resolved by the judiciary, are paramount in public rights analysis. As the plurality noted in *Northern Pipeline*:

> Doubtless it could be argued that the need for independent judicial determination is greatest in cases arising between the Government and an individual. But the rationale for the public-rights line of cases lies not in political theory, but rather in Congress' and this Court's understanding of what power was reserved to the Judiciary by the Constitution as a matter of historical fact.

458 U.S. at 68 n.20, *cited in Schor*, 478 U.S. at 854.

[7] The public rights analysis obtains with respect to "new" rights created by congressional statutes, as well as to non-Article III adjudication of common law claims not embodied in a congressional statute. *See Curtis* v. *Loether*, 415 U.S. 189, 193 (1974) ("We have considered the applicability of the constitutional right to jury trial in actions enforcing statutory rights 'as a matter too obvious to be doubted.'"). *See also Tull*, 481 U.S at 420; *Pernell* v. *Southall Realty*, 416 U.S. 363, 375 (1974). Indeed, a contrary conclusion would make nonsense of the Court's emphasis on the historical lineage of the right and would essentially eviscerate the protection of Article III and the Seventh Amendment, because Congress always makes law by embodying "new" rights in a statute.

55

public rights. *Northern Pipeline*, 458 U.S. at 67–68 (plurality opinion) (quoting *Crowell*, 285 U.S. at 50). *See also Schor*, 478 U.S. at 853–54 ("when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is less than when private rights, which are normally within the purview of the judiciary, are relegated as an initial matter to administrative adjudication"); *Thomas*, 473 U.S. at 589; *Ex parte Bakelite Corp.*, 279 U.S. at 458; *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U.S. 320, 339 (1909). The Court has thus concluded that disputes involving newly created rights unknown to the common law or matters that, as an historical matter, "could be conclusively determined by the Executive and Legislative Branches," may be adjudicated by non-Article III forums. *Thomas*, 473 U.S. at 589 (quoting *Northern Pipeline*, 458 U.S. at 68 (plurality opinion)). In such circumstances, the dispute is not over the scope of the federal statutory duty X owes to Y, but the scope of the Government's authority in administering its own programs; it is thus a dispute between the Government and others. Accordingly, the Court has looked to whether the rights asserted are derived from a comprehensive regulatory scheme concerning a specialized area, such as federal broadcast licenses and "entitlements" to federal welfare benefits. *See, e.g., Schor*, 478 U.S. at 854–56; *Thomas*, 473 U.S. at 600–01 (Brennan, J., concurring).

It is more difficult to discern whether public rights are created by virtue of the Government's participation in matters not committed to its exclusive and all-encompassing regulatory discretion. Specifically, it is unclear what significance should be attached to the mere fact of Government participation in a representative or prosecutorial capacity, rather than in its capacity as administrator of its own regulatory programs.

The Court has recently established that neither the presence nor the absence of the Government as a party of record is dispositive in resolving whether a particular right is public or private.[8] Rather, one must "loo[k] beyond form to the substance of what [the statutory scheme] accomplishes" with due regard for "the origin of the right at issue [and] the concerns guiding the selection by Congress of a particular method for resolving disputes." *Id.* at 587, 589.

For this reason, as we previously stated with respect to another proposed amendment to the Fair Housing Act, the Government's participation is of little significance if it "simply has stepped into the individual's shoes in [the] administrative proceeding, and is suing in a representative capacity."[9] In this

---

[8] In *Northern Pipeline*, the plurality stated: "It is thus clear that the presence of the United States as a proper party to the proceeding is a necessary but not sufficient means of distinguishing 'private rights' from 'public rights.' " 458 U.S. at 69 n.23. Only a few years later, however, a majority of the Court rejected this "bright-line test" as exalting form over substance, holding that the United States' party status was neither necessary nor sufficient in resolving the public rights question for purposes of Article III. *Thomas*, 473 U.S. at 586. In *Thomas*, the Court rejected both the view that "the right to an Article III forum is absolute unless the federal government is a party of record" and the contrary view that "Article III has no force simply because a dispute is between the Government and an individual." *Id.*

[9] "Seventh Amendment Implications of Providing for the Administrative Adjudication of Claims Under Title VIII of the Civil Rights Act of 1968," 9 Op. O.L.C. 32 (1985).

context, the Government simply acts as a prosecutor to vindicate the rights of one private individual against another, not to resolve a dispute between an individual and the Government *qua* Government; it is thus difficult to discern why the presence of the United States should convert such private disputes into "public" rights. Giving such talismanic effect to the Government's mere initiation of an administrative complaint would be inconsistent with *Thomas'* admonition that public rights analysis should not be a formalistic endeavor that focuses on the "identity of the parties alone" without "regard to the origin of the right at issue." *Id.* at 587. As one commentator has noted, any such understanding of the Court's Article III precedent does indeed result in "[f]orm . . . replac[ing] substance: Congress could avoid conferring jurisdiction upon an Article III court simply by altering the party structure in its new action, by replacing the private plaintiff with a government prosecutor." L. Tribe, *American Constitutional Law* 43 (1978).[10]

Nevertheless, there are cases in which administrative schemes have provided incidental relief to private parties in the course of enforcing public policy. *See Schor, supra; NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937); *Block* v. *Hirsh*, 256 U.S. 135 (1921). The relief available in *Jones & Laughlin*, however, was essentially equitable in nature (reinstatement and backpay), and only the NLRB could seek court enforcement of the order.[11] Moreover, although the Court often cites *Block* v. *Hirsh*, 256 U.S. 135 (1921), for the proposition that what would usually be viewed as a private right — a landlord/tenant dispute — can be a "public right,"[12] it does so without noting what the *Block* court itself recognized. The case arose during an extraordinary housing shortage in the District of Columbia caused by World War I, which had transformed housing from its normal status as a matter of private sector concern into a matter of grave public concern: "circumstances have clothed the letting of buildings in the District of Columbia with a public interest so great as to justify regulation by law." *Id.* at 155. Thus, *Block* did not involve a purely private right: "The [rent] commission did not . . . afford all-purpose relief to complaining private parties." 2 Op. O.L.C. 16, 19 (1978). As we have previously observed, "[i]t cannot be concluded, based on these rather limited precedents, that administrative proceedings initiated by a public agency but providing the full panoply of judicial relief to private parties are necessarily permitted under the Seventh Amendment." *Id.*

Further, the Court, principally in the *Schor* opinion, has considered two other factors in determining whether judicial resolution of particular disputes is

---

[10] As we stated with regard to a 1978 proposal that would have authorized the Department of Housing and Urban Development to file administrative complaints:

> It could be argued that Congress should not be able, under the vague rubric "public right," to circumvent the Seventh Amendment completely by creating a chain of administrative courts capable of giving traditional common-law remedies to private litigants seeking relief from wrongs (such as dignitary torts) traditionally regarded as private in character.

"Fair Housing — Civil Rights Act," 2 Op. O.L.C. 16, 20 (1978).

[11] 2 Op. O.L.C. at 19 (citing *Amalgamated Utility Workers* v. *Consolidated Edison Co.*, 309 U.S. 261 (1940)).

[12] *See, e.g., Thomas*, 473 U.S. at 589.

constitutionally required. Although the Court's language admits of differing interpretations, we do not view these factors as interpretive aids in defining the public right but rather as exceptions to the public right doctrine. In other words, these factors identify the narrow circumstances in which non-Article III adjudication of arguably private rights may be permissible.

First, *Schor* establishes that the Court will attach great, if not dispositive, significance to whether the party asserting a constitutional deprivation has participated in the non-Article III proceeding on a purely voluntary basis and thus has effectively waived any right to complain. The complaining party in *Schor* had opted for the CFTC's administrative forum rather than state or federal courts with full knowledge that the regulatory scheme allowed the CFTC to exercise jurisdiction over all counterclaims, including those involving matters of state law; indeed, the complaining party then "expressly demanded that [the opposing party] proceed on its [state law] counterclaim in the [administrative] proceeding rather than before the District Court." 478 U.S. at 849. Although the *Schor* Court determined that Article III separation of powers limitations, unlike Seventh Amendment rights, cannot be "waived" by a private litigant, it nonetheless made clear that the purely voluntary nature of the proceedings severely minimized any Article III concerns that might otherwise have obtained: "just as Congress may encourage parties to settle a dispute out of court or resort to arbitration without impermissible incursions on the separation of powers, Congress may make available a quasi-judicial mechanism through which willing parties may, at their option, elect to resolve their differences." *Id.* at 855. *See also id.* at 849 (noting that "the absence of consent to an initial adjudication" was "a significant factor" in *Northern Pipeline*'s condemnation of Article I bankruptcy courts).[13]

Second, the *Schor* Court also seemed to permit administrative adjudication of private rights, at least where participation in the administrative process is voluntary, if those private claims are wholly ancillary to the public rights created by the federal regulatory scheme and if their resolution in the administrative process is necessary to enable resolution of the statutory public rights in that forum. The issue in *Schor* concerned a CFTC administrative process established to provide reparations to "disgruntled customers of professional commodity brokers seek[ing] redress for the brokers' violations of the Act or CFTC regulations." *Id.* at 836. When Mr. Schor invoked this procedure, his broker counterclaimed, on state law grounds, for a debit balance which Mr. Schor alleged had resulted from the broker's violations of the Commodity Exchange Act that were at issue in the administrative proceeding. If resolution of such private state law counterclaims was not permitted in the administrative forum, administrative resolution of the public rights created by the CEA would never occur, as a practical matter, "for when the broker files suit to recover the debit balance, the customer will normally be compelled either by compulsory

---

[13] The Court in *Thomas* described the chemical companies as "voluntary participants in the program," 473 U.S. at 589, although the only element of choice seems to have been whether to engage in the manufacture of chemicals.

counterclaim rules or by the expense and inconvenience of litigating the same issues in two fora to forgo his reparations remedy and to litigate his claim in court." *Id.* at 843–44.

Accordingly, *Schor* created an exception to the public rights doctrine, which permits resolution of private claims in otherwise valid administrative schemes where resolution of those private rights "is limited to that which is necessary to make the [scheme] workable" by resolving the public rights created by the regulatory scheme. *Id.* at 856. As the Court put it, "absent the CFTC's exercise of that authority [over state law counterclaims], the purposes of the [administrative] reparations procedure would have been confounded." *Id.* at 856. In context, then, *Schor*'s departure from the public rights line of cases is clearly premised on the voluntary and necessary aspects of the administrative tribunal's resolution of private rights.

Finally, and most generally, the Court has looked to the "concerns motivating the legislature" in choosing a non-Article III forum. *Thomas,* 473 U.S. at 590. In this regard, the Court has attached significance to a showing that there is an "imperative necessity" for administrative procedures because of the specialized, complex nature of the subject matter and a demonstrated need for expedited adjudication. *Murray's Lessee,* 59 U.S. (18 How.) at 282. *See also Schor,* 478 U.S. at 852; *Thomas,* 473 U.S. at 590. *Cf. Palmore* v. *United States,* 411 U.S. 389, 407–08 (1973). The rationale here is that strong "evidence of valid and specific legislative necessities," *Schor,* 478 U.S. at 855, can be accommodated without unduly disrupting separation of powers concerns because such exceptions are limited in scope and reveal that Congress' sole motivation was to solve a pressing emergency, not to avoid Article III adjudication for its own sake. *See id.* at 855–57; *Thomas,* 473 U.S. 590–593.

## 2. Analysis

Application of these principles to the draft bill leads us to conclude that it is of doubtful constitutional validity. Although S. 558, unlike the draft bill, provides that the Department of Housing and Urban Development (HUD) will act as the moving party in an administrative proceeding, we do not believe that this difference alone should substantially affect the constitutional inquiry.[14] We will analyze each of the proposed bills in turn.

---

[14] We do not believe that the use of administrative law judges to determine punitive damages may be upheld on the theory that the administrative proceeding is merely an adjunct to the district court. The Supreme Court has upheld against Article III challenges the use of administrative agencies as factfinders in cases involving private rights "only as an adjunct to an Art. III court, analogizing the agency to a jury or a special master." *Atlas Roofing,* 430 U.S. at 450 n 7. However, we do not believe that these cases uphold the use of adjuncts in cases involving private rights that are also actions at common law. As originated in *Crowell,* the adjunct theory did not include private rights of action found at common law. *Crowell* involved a case arising in *admiralty* and the Court distinguished this from common law actions· "In cases of equity and admiralty, it is historic practice to call to the assistance of courts" non-judicial factfinders. 285 U.S. at 51. However, "on the common law side of the Federal courts, the aid of juries is not only deemed appropriate but is required by the Constitution itself." *Id.* Thus, the Court recognized that juries — not non-judicial factfinders —

Continued

Perhaps the most important consideration in assessing the draft bill's proposed administrative proceeding is that the right adjudicated is derived from a common law action that is historically within the exclusive preserve of Article III courts. In *Curtis* v. *Loether*, 415 U.S. 189 (1974), the Court concluded:

> We think it is clear that a damages action under 812 [of the Fair Housing Act] is an action to enforce "legal rights" within the meaning of our Seventh Amendment decisions. A damages action under the statute sounds basically in tort — the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach. As the Court of Appeals noted, this cause of action is analogous to a number of tort actions recognized at common law. More important, the relief sought here — actual and punitive damages — is the traditional form of relief offered in the courts of law.

*Id.* at 195–96 (citations omitted). Thus, the statutory right to be adjudicated in the draft bill's administrative proceeding is directly analogous to a cause of action that was subject to judicial resolution at the time the Constitution came into being, thus creating a strong presumption that it must be tried in an Article III court pursuant to normal procedures. Moreover, the Civil Rights Division draft bill provides that actual and punitive damages may be awarded in the arbitration hearing. § 813. As indicated earlier, these are classic "legal" remedies of the type that could be awarded only by a court of law with a jury, not by a court of equity. *See Tull*, 481 U.S. at 423 n.7. *Cf. Atlas Roofing*, 442 U.S. at 459, 460 (The Seventh Amendment is intended to "preserve" the right to a jury trial in common law suits, not to require them where none was previously required.).

Further, wholly apart from its historical roots, the right at issue here is private in nature, in that it is intended to determine the liability of one individual to another. *Crowell*, 285 U.S. at 51. Under the Civil Rights Division draft bill, virtually the only role played by the Government is to provide a

---

[14] (. . . continued)
were required in cases involving common law questions. *Crowell's* language certainly supports an argument that the Seventh Amendment prevents Congress from placing actions that are both private and based on common law actions beyond the reach of a jury trial. *Crowell* reads the Seventh Amendment as requiring a jury in cases arising under the common law, while permitting agencies to act as *de facto* juries for private rights arising in equity or admiralty. *Id.* at 51. *See also Northern Pipeline*, 458 U.S. at 81–82 (plurality opinion) ("*Crowell* does not support the further proposition necessary to appellants' argument — that Congress possesses the same degree of discretion in assigning traditionally judicial power to adjuncts engaged in the adjudication of rights *not* created by Congress.") (emphasis in original); *United States* v. *Raddatz*, 447 U.S. 667 (1980). We are especially reluctant to adopt this adjunct theory in the Seventh Amendment context when to do so would permit Congress to take from the courts a factfinding function that courts do not have in common law actions under the Seventh Amendment. *See Tull, supra*. Unlike the action at issue in *Raddatz*, the right being resolved under the draft bill is not one a court could decide if it wished; the right to punitive damages has to be resolved by a jury. The adjunct theory, if applied to private rights based on common law actions would render the Seventh Amendment's protection hollow, dependent entirely upon the whim of a congressional majority.

60

federal rule of decision that defines the liability between private actors. Under the proposed bill, only private litigants may initiate the administrative proceeding and they may themselves seek review or enforcement of the arbitrator's order in court. § 813(a)(1), (c). Although HUD may prevent formal arbitration by not issuing a "reasonable cause" determination and may intervene in the hearing, the entire matter may well proceed to final judgment without Government participation, and, in any event, HUD's intervenor role would clearly be limited to vindicating the rights of the private litigant. In this regard, we note as well that civil rights statutes generally are intended to create personal rights, guaranteed to the individual. *See generally Connecticut* v. *Teal*, 457 U.S. 446 (1982); *Regents of the Univ. of Cal.* v. *Bakke*, 438 U.S. 265, 299 (1978) (opinion of Powell, J.); *Los Angeles Dep't of Water & Power* v. *Manhart*, 435 U.S. 702, 708, 709 (1978); *Shelly* v. *Kraemer*, 334 U.S. 1, 22 (1948). In short, because the statutorily created right here derives from a dignitary tort and is enforceable primarily by private individuals for their own benefit pursuant to common law remedies, the Court's precedents strongly indicate that these administrative hearings will be viewed as "wholly private tort . . . cases [that] are not at all implicated" by the public right exception described in *Atlas Roofing. Atlas Roofing*, 430 U.S. at 458.

Moreover, none of the other factors on which the Court has focused militate in favor of the draft bill's validity. It is clear that a defendant would be an involuntary participant in the arbitration proceedings, and it seems quite doubtful that the private housing market in the United States would generally be considered a "specialized area" for administrative regulation by the federal government. Further, the exception created in *Schor* for ancillary and necessary private claims is inapplicable since adjudication of common law claims is clearly not "incidental to, and completely dependent upon, adjudication of . . . claims created by federal law." *Schor*, 478 U.S. at 856.[15]

---

[15] We note that the Civil Rights Division's draft bill, as well as S. 558, provides for court enforcement of the administrator's award. Draft bill, § 813(d), (g); S. 558, § 812(h), (i). We confess that we are uncertain whether this is an argument in favor of or against the proposed bill's constitutional validity, because the Court's precedents point in opposite directions. Under the adjunct theory of Article III, assignment of some limited functions to a non-Article III tribunal is sometimes permissible, so long as "'the essential attributes' of judicial power are retained in the Art. III court." *Northern Pipeline*, 458 U.S. at 81 (plurality opinion). *See also Crowell*, 285 U.S. at 51. Thus, under the adjunct theory as traditionally understood, it was quite clear that the constitutional permissibility of the statutory scheme was *enhanced* if the non-Article III forum was given only quite limited "judicial" powers, such as the right to enforce its own orders. Quite naturally, therefore, *Northern Pipeline*, in contrasting *Crowell*, said that a major *defect* in the bankruptcy courts scheme was that those non-Article III tribunals could enforce their own orders without "seek[ing] enforcement in the district court." *Northern Pipeline*, 458 U.S. at 85 (plurality opinion). *See also id.* at 91 (Rehnquist, J., concurring); *Crowell*, 285 U.S. at 51. In *Thomas*, however, the Court stated that the Article III validity of the arbitration scheme was *enhanced* because it "relie[d] tangentially, if at all, on the Judicial Branch for enforcement" of the arbitrators' orders, *Thomas*, 473 U.S. at 591, a conclusion that seems directly at odds with *Crowell*, *Northern Pipeline*, and the entire rationale of the adjunct theory as previously understood. *See Crowell*, 285 U.S. at 33–38. Fortunately, we need not engage in the task of reconciling these cases, because we have previously concluded that the adjunct theory is probably inapposite here because the statutory right to be enforced is derived directly from a private, common law claim. We note, parenthetically, that the powers assigned to the arbitrator under the draft bill and S. 558 are considerably greater than the power (*i.e.*, assessment of value) assigned to the adjunct in *Crowell*, but less than the plenary powers given to the bankruptcy courts in *Northern Pipeline. See* 9 Op. O.L.C. at 40.

61

We further note that the Fair Housing Act certainly does not seem to involve the imperative necessity that the Court recognized in *Thomas* as a legitimate motivating factor for Congress' consideration in choosing an arguably prompter administrative remedy. 473 U.S. at 590. Indeed, the *Curtis* Court rejected similar arguments advocating the need for expedited *judicial* review of Title VIII actions without a jury trial. Noting the availability of preliminary injunctions and non-jury trials in cases seeking only equitable relief, the Court stated "[m]ore fundamentally, however, these considerations are insufficient to overcome the clear command of the Seventh Amendment." 415 U.S. at 198. It is nonetheless conceivable that a strong legislative record demonstrating that administrative trials are for some reason necessary meaningfully to resolve Fair Housing cases would tend to support the validity of the congressional purpose in opting for these proceedings. Of course, any such claim is substantially undermined by the fact that judicial proceedings remain available to plaintiffs so inclined, thus undercutting any notion that administrative proceedings are "necessary."

Indeed, in the circumstances presented here, the congressional purpose underlying the establishment of administrative proceedings may well be viewed as a substantial deficiency, because the draft bill's structure and background suggest that the sole purpose of the administrative alternative is simply to supplement or displace adjudication by Article III courts and juries. In this regard, it is significant that "there are only minimal differences between the relief available in the administrative forum (in which a civil penalty for the Government replaces punitive damages for the individual) and the judicial forum." 9 Op. O.L.C. at 37. By providing for punitive damages in either the administrative or judicial forum, moreover, the draft bill leaves it entirely up to a plaintiff in an individual case to choose between the Article III and Article I fora, without sacrificing any weapon in his arsenal of remedies. Thus, the clear effect of the Act is to create parallel, virtually identical Article III and Article I processes — a dualism that serves no apparent purpose other than enhancing plaintiff's options and his ability to avoid bringing his case before a jury or an Article III judge.

We do not mean to suggest that providing plaintiffs with a choice between such parallel schemes by itself raises independent due process problems, even where, as here, it renders the defendant's right to a jury trial utterly dependent on the plaintiff's choice of fora. However, the dual structure may well directly signal "the concerns guiding the selection by Congress of a particular method for resolving disputes." *Thomas*, 473 U.S. at 587. In this regard, it is also noteworthy that "the Department would enter the fray, not at the outset, but nearly [19] years after the creation of a private cause of action in the district court which provides for identical remedies, and nearly [13] years after the Supreme Court expressly ruled that under such circumstances trial by jury must be available on demand." 2 Op. O.L.C. at 20.

Against this backdrop, a reviewing court may fairly conclude that, in contrast to *Schor*, Congress' "primary focus was [not] on making effective a

specific and limited federal regulatory scheme, [but] on allocating jurisdiction among federal tribunals." *Schor*, 478 U.S. at 855. In other words, the background and parallel structure of the Act might well strongly suggest that the "concerns that drove Congress to depart from the requirements of Article III," *id.* at 851, were merely Congress' desire to depart from the requirements of Article III because of the cost and delay that attend a jury trial in a federal court. Although the speed and efficiency of Article I tribunals are virtues, we believe that speed and efficiency alone cannot be viewed as sufficient reason for establishing Article I adjudication absent "imperative necessity." Indeed, acceptance of such a justification would lead to the somewhat circular rule that Congress may avoid the constraints of Article III and eliminate the Seventh Amendment rights ringingly endorsed in *Tull* solely on the ground that it believes that Article III adjudication is more cumbersome than alternative dispute resolution without judges and juries.

We turn next to consideration of S. 558, which is identical to the draft bill in all material respects save one: it provides that HUD may institute administrative proceedings "on behalf of the aggrieved person filing the complaint" of housing discrimination, rather than the aggrieved person himself. S. 558, § 810(g)(2)(A). Significantly, the private complainant has a right to file a complaint or to intervene as a full party in an administrative proceeding initiated by HUD, and he apparently may obtain both judicial enforcement and review of an adverse decision even if HUD does not go forward. *Id.*, §§ 810(a), 812(h)(2). Although, for the reasons noted above, the issue is hardly free from doubt, we think that the better view is that HUD's participation in initiating the complaint is not alone sufficient to obviate the constitutional difficulties previously described.

As we have suggested, HUD's participation as a party in these circumstances says very little about the "public" nature of the right involved, but simply describes the parties that are authorized to enforce that right. For this reason, the better understanding of the Court's precedent is that the Government's party status should not be given dispositive weight, particularly where, as here, the Government does not possess exclusive enforcement authority.

. We are fortified in our conclusion by the fact that this Office has previously determined, albeit not without equivocation or difficulty, that a proposed 1978 amendment to the Fair Housing Act, virtually indistinguishable from S. 558, was probably unconstitutional. We so concluded because, as with S. 558, HUD "would not be the sole enforcer of the statutorily created" government policy and would not be acting in a regulatory capacity with regard to a public right.[16]

An opinion that we rendered in 1985 points to a similar conclusion. There we concluded, albeit tentatively, that a proposed amendment would probably survive constitutional scrutiny, but we did so in large part because the administrative process failed to "provide the aggrieved individual the punitive dam-

---

[16] 2 Op. O.L.C. at 20. Although acknowledging the difficulty of the issue, we concluded: "were we to opine one way or the other, our conclusion would probably favor a finding that [the proposal] is unconstitutional." *Id.*

63

ages typically available at common law." 9 Op. O.L.C. at 38. As noted, S. 558, like the draft bill, does provide this traditional legal remedy, thus substantially reinforcing the private, common law nature of the cause of action and rendering the administrative hearing virtually identical to a judicial proceeding.

It should be noted, however, that *Thomas* and *Schor*, two subsequent decisions of the Supreme Court have evinced less sympathy for constitutional challenges to administrative proceedings and upheld statutes that share some, though clearly not all, of the defects described above. Nevertheless, for the reasons that we have previously indicated, a review of the *Thomas* and *Schor* opinions persuades us that they contain nothing that requires an analysis or conclusion different from those expressed in our prior memoranda. First, with respect to the specific question of the Government's party status, *Thomas* reinforces the correctness of our previous determination that such party status means little unless it affects the "substance of what [the statute] accomplishes." *Thomas*, 473 U.S. at 589. Second, *Schor*'s arguable departure from prior cases is not of controlling importance here because the proposed bills contemplate the involuntary participation of the defendant in administrative hearings and do not adjudicate private rights in order to preserve the agency's practical ability to adjudicate public rights.

Finally, we discern nothing in *Thomas* that either signals any sort of wholesale retreat from the Court's Article III jurisprudence or lends meaningful support to the proposed bills. *Thomas* simply upheld the administrative implementation of a comprehensive federal regulatory scheme in an opinion joined by every member of the *Northern Pipeline* plurality that reached the merits of the case. *See Thomas*, 473 U.S. at 595 (Brennan, J., concurring). At issue in *Thomas* was administrative resolution of a very mechanical and straightforward dispute over the amount of compensation owed for access to privileged data, a dispute that nonetheless needed to be resolved expeditiously if the administrative scheme was to accomplish its purpose. As the Court noted, "Congress, without implicating Article III, could have authorized EPA to charge follow-on registrants *fees*" and that such "rate-making is an essentially legislative function." *Id.* at 590 (emphasis added). Thus, the charging of such fees was a matter that "could be conclusively determined by the Executive and Legislative Branches." *Id.* at 589 (quoting *Northern Pipeline*, 458 U.S. at 68). Conversely, the Court placed heavy reliance on the fact that the statute at issue did not "displac[e] a traditional cause of action [or] affec[t] a pre-existing relationship based on a common-law [claim]" because the statutory right to compensation "does not depend on or replace a right to such compensation under state law." *Id.* at 584, 587. In short, *Thomas* broke no new Article III ground because "at its heart the dispute involve[d] the exercise of authority by a federal government arbitrator in the course of administration of [the statute's] comprehensive regulatory scheme. As such it partakes of the characteristics of a standard agency adjudication." *Id.* at 600 (Brennan, J., concurring).

Having said all that, we emphasize that, due to the meandering and confusing course of the Court's precedent, it is both impossible to offer any determi-

native opinion in this area and possible to construct a defense of the proposed bills that may prevail in some courts. A line of defense that might be accepted by a sympathetic court would proceed along the following lines. First, elimination of racial and ethnic discrimination in housing is a paramount public purpose. Further, Congress has great discretion in choosing the manner in which to resolve disputes, so long as the subject matter of the dispute concerns an area over which Congress permissibly exercises authority, including any area it may reach pursuant to the Commerce Clause. *See Atlas Roofing*, 430 U.S. at 456–457; *Northern Pipeline*, 458 U.S. at 105–113 (White, J., dissenting) (collecting authorities). Moreover, under a highly formalistic approach, a court could conclude that the common law antecedents of § 812 of the Fair Housing Act are unimportant because Congress created a "new" statutory duty when it outlawed housing discrimination, and that the presence of the United States, at least as the moving party under S. 558, is of great significance. The court could further determine that housing discrimination is a "specialized area" requiring administrative expertise and that it should defer to Congress' determination that there is a tangible need for expedited review. More generally, a court could fairly note that differentiating between public and private rights or the regulatory and prosecutorial role of the government is a highly abstract endeavor that has not received, and is not susceptible to, principled or consistent resolution.

We acknowledge that there is language in some of the Court's cases that can be interpreted to support such a line of analysis. This sort of analysis would place virtually no limits on congressional authority to remove the resolution of disputes entirely from Article III courts. Congress always creates "new" rights by enacting statutes; these statutes must always be directed at an area which Congress has the power to regulate, and administrative tribunals are always more expeditious and convenient than juries and judges. Indeed, such an analysis comes perilously close to subordinating Article III's reservation of the "judicial Power" and the express guarantees of the Seventh Amendment to the Necessary and Proper Clause.[17] Accordingly, we believe the draft bill and S. 558 in their current form are and would likely be declared unconstitutional on Article III and Seventh Amendment grounds.

## II. Conclusion

Although the policy implications of any modification to the draft bill are obviously for you to resolve, we recommend certain changes in order to enhance the constitutional viability of the draft bill. All concerns under the Seventh Amendment and Article III would be alleviated, of course, by deletion of the provisions establishing an administrative hearing process. Short of this, the best solution from a constitutional perspective would be to limit the relief available in an administrative proceeding to equitable remedies such as injunc-

---

[17] Nor do we understand why the grave importance of a public policy is an argument supporting *removal* of that controversy from an impartial judiciary insulated from political influence.

tions and restitution, thus avoiding any conflict with the Seventh Amendment's preservation of jury trials in "suits at Common Law." At a minimum, serious consideration should be given to eliminating at least punitive damages for private litigants in the arbitration proceedings. The retention of compensatory damages alone might be upheld under reasoning similar to that the reasoning that we outlined in 1985. *See* 9 Op. O.L.C. 32.

CHARLES J. COOPER
Assistant Attorney General
*Office of Legal Counsel*